UNITED STATES of America, Appellant,

v.

Stephen M. RAKES, Defendant, Appellee.

No. 97–1693.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1997.

Decided Jan. 29, 1998.

Richard L. Hoffman, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, and James D. Herbert, Assistant United States Attorney, Boston, MA, were on brief for the United States.

Michael F. Connolly with whom Francis X. Bellotti, Valerie B. Robin and Mintz, Levi, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, were on brief for appellee.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

In May 1996, Stephen Rakes was indicted by a federal grand jury and charged with perjury and obstruction of justice. Prior to trial, Stephen Rakes moved to suppress conversations between him and his former wife, Julie Rakes, and between him and his one-time attorney, John P. Sullivan. The district court granted the motion, except for one conversation, and the government now appeals.

The facts are readily gleaned from testimony taken by Judge Lindsay in an *in camera* hearing on the motion to suppress.[1] Stephen and Julie Rakes were married in 1978 and engaged in various business ventures together. In 1983, with the help of their attorney, John Sullivan, the Rakes couple established a corporation named Stippo's, Inc., as their jointly owned company to operate a liquor store business at a site on Old Colony Avenue in South Boston. The store opened shortly before Christmas 1983.

The government believes that not long thereafter, the Rakeses were threatened by unnamed people in South Boston who were angry that the Rakeses were underpricing competitors. Then, in early January 1994, the government believes that James "Whitey" Bulger visited Stephen Rakes at home while Julie was at the liquor store and threatened to kill Stephen unless Bulger or his associates were made partners in the liquor store. By May 1984, again with the assistance of Sullivan, the Rakeses had transferred Stippo's, Inc., to another individual, whom the government believes was associated with Bulger, for a fraction of what the government says was its real value.

In May 1991, the government summoned Stephen Rakes before a federal grand jury in Massachusetts investigating extortion, racketeering and money laundering. The government questioned Rakes about the transfer of Stippo's, Inc., to the alleged Bulger associate. Rakes testified that he had sold the store to make a profit and because it was too much work, and said that no one had threatened him to make him sell the store.

In September 1995, Stephen Rakes gave similar testimony before a second federal grand jury. Thereafter, the government called Julie Rakes and Sullivan before the same grand jury. Although Sullivan initially refused to discuss his conversations with Stephen and Julie Rakes, the government secured an order from district judge compelling Sullivan's testimony. Stephen Rakes was not advised that the proceedings to compel Sullivan's testimony were under way.

In May 1996, the grand jury indicted Stephen Rakes, charging him with five counts of perjury based on his grand jury testimony, 18 U.S.C. § 1623, and two counts of obstruction of justice, 18 U.S.C. § 1503; the obstruction counts charged that Rakes' grand jury testimony had been false and intended to obstruct the grand jury. Three counts of the indictment were later dismissed as multiplicitious but four others remain pending.

Asserting the privilege for confidential marital communications, Stephen Rakes moved to suppress evidence of conversations in December 1983 and January 1984 between him and Julie Rakes concerning alleged threats and the sale of Stippo's. He also asked the court to suppress, on grounds of attorney-client privilege, conversations between Stephen Rakes or both Rakeses and Sullivan concerning the sale of Stippo's, Inc. and the purpose of the sale. The district

---

1. The hearing was conducted *in camera* to avoid public disclosure of the assertedly privileged materials, and the briefs in this court have been filed under seal. This opinion was filed under seal and the parties, having now reviewed it, have no objection to its publication.

court held four days of hearings on the motion.

In April 1997, the district court granted Stephen Rakes' motion with one exception: it denied the motion as to one conversation between Stephen and Julie Rakes, apparently because it took place in the presence of a third party. The district court identified the materials to be suppressed but, presumably because of the risk of disclosure of privileged information, did not write a supporting opinion or make separate findings of fact. The government then brought this interlocutory appeal. *See* 18 U.S.C. § 3731.

We will assume *arguendo* the relevance of the suppressed conversations to the government's prosecution. At the same time, most of the formal requisites for the attorney-client and marital communications privileges are clearly met; the government's main claim is that the privileges were waived or forfeited. In a federal criminal case, privileges take their content from the common law as it may be altered from time to time in the light of reason and experience. Fed. R.Evid. 501.

■ No brief version of either the marital communications or attorney-client privilege can be both complete and accurate. But, broadly stated and subject to exceptions, the former privilege permits an individual to refuse to testify, and to prevent a spouse or former spouse from testifying, as to any confidential communication made by the individual to the spouse during their marriage.[2] The latter privilege, again with exceptions, protects at the client's behest confidential communications between lawyer and client made to facilitate legal services for the client.[3]

The communications suppressed by the district court between Stephen and Julie Rakes were made in the absence of third parties and in the course of their marriage;

that the Rakeses later divorced is irrelevant, and the government properly makes nothing of the possibility that one of the conversations occurred in the presence of their infant children. Similarly, Stephen Rakes' communications with Sullivan were made during the course of Sullivan's representation of Rakes and were related to legal services, and no one was present except one or both of the Rakeses and attorney Sullivan.

Both the content and context of the communications support the implicit finding by the district judge that Rakes intended his conversations, with both his wife and his attorney, to be confidential. Further, if Stephen Rakes had been threatened, as the government alleges, he had ample reason over and above any ordinary interest in privacy to want them to be kept confidential. We reserve for discussion below the government's claim that *later* disclosures by Stephen Rakes undermine the claim of confidentiality.

■ The government suggests that some general rule deprives spousal conversations of the privilege if they relate to financial matters; needless to say, it does not make this claim in respect to the attorney-client privilege. The marital communications privilege contains no such limitation: the cases say, at most, that a discussion of financial matters between husband and wife may not be intended to be confidential. *E.g., In re Witness Before Grand Jury*, 791 F.2d 234, 239 (2d Cir.1986). In this case, however, the subject was manifestly sensitive, albeit not for the usual reasons.

■ Nor do we agree with the government's suggestion that communications were not privileged insofar as Stephen Rakes may have been relating to his wife events that occurred prior to the communication. It is true that "communications" privileges typically prevent inquiry into communications

---

2. *See, e.g.,* Unif. R. Evid. 504(a); J. Strong, et al., *McCormick on Evidence* §§ 78–86 (4th ed.1992); *Blau v. United States*, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951). The separate marital privilege—to refuse to testify against a spouse in a criminal case—is not pertinent here. *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980).

3. Unif. R. Evid. 502(b); *McCormick* §§ 87–97; *Upjohn Co. v. United States*, 449 U.S. 383, 389–90, 101 S.Ct. 677, 682–83, 66 L.Ed.2d 584 (1981); *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358 (D.Mass.1950) (Wyzanski, J.).

and not into the underlying facts, *Upjohn Co. v. United States,* 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981), although the subject is more complicated than this generalization suggests.[4] But the district court's suppression order was directed to communications, not to facts, and that is enough for present purposes.

■ This brings us to the main thrust of the government's argument, namely, that "[t]he suppressed communications are not privileged because they occurred during an ongoing extortion scheme." A crime of extortion, says the government, extends from the initial threat through the actual obtaining of the property. *See* 18 U.S.C. § 1951(b)(2); *United States v. Bucci,* 839 F.2d 825, 829–30 (1st Cir.1988). Here, the government says that the crime extended from the first alleged threat in December 1983 through the completion of the property transfer in May 1984, a period embracing all but one of the communications that the government seeks to use.

■ No general rule withdraws the privilege from communications that occur in the same time frame as criminal act conduct. *See In re Grand Jury Subpoenas Duces Tecum,* 798 F.2d 32, 34 (2d Cir.1986). But both the privileges involved here are subject to some type of crime-fraud exception. Thus, the attorney-client privilege is forfeited *inter alia* where the client sought the services of the lawyer to enable or aid the client to commit what the client knew or reasonably should have known to be a crime or fraud. *E.g.,* Unif. R. Evid. 502(d)(1); *McCormick, supra,* § 95.

The counterpart limitation in the case of marital communications is not necessarily identical; it is expressed in somewhat different terms in different jurisdictions.[5] However, we will assume for present purposes—

favorably to the government—that the privilege for marital communications would be lost to Stephen Rakes if he made the communications in question to Julie for the purpose of carrying out a crime.

The government concedes that Stephen and Julie Rakes were the "victims" of an extortion scheme. But to invoke the crime-fraud exception, the government also says (the emphasis is ours) that "the communications suppressed by the District Court occurred while *the Rakeses were participating in carrying out the [extortion] scheme* and covering it up, and while Stephen was persuading Julie to do so." This, says the government, entails loss of the privilege.

Yet, on the government's own version of events, the Rakeses were not participants in the extortion in any capacity other than that of victim. The Rakeses were participants only in the very specialized sense that the victim of a robbery "participates" by handing over his wallet under threat of violence, or the victim of a rape "participates" by offering no further resistance when resistance appears futile or dangerous. This is not the kind of participation in an offense that, in our view, vitiates the privilege.

It is no accident that the government's case law is remote from the present facts and consists of cases where one spouse enlisted a second spouse in a criminal venture, *e.g., United States v. Parker,* 834 F.2d 408, 412–13 (4th Cir.1987), or a wife knowingly assisted a husband in criminal conduct, *e.g., United States v. Picciandra,* 788 F.2d 39, 43–44 (1st Cir.1986). Here, even the government shrinks from flatly asserting that the Rakeses were *criminally* liable for extortion.

We have considered the government's further suggestion that Stephen Rakes engaged in misconduct by inducing his wife not to report the threat against him. It is enough

---

4. Where an attorney knows facts only because they were confidentially communicated by the client, the government cannot circumvent the privilege by asking the attorney about "the facts." *See Upjohn,* 449 U.S. at 395, 101 S.Ct. at 685. The same rule applies to the marital communications privilege. *Blau,* 340 U.S. at 333, 71 S.Ct. at 302.

5. *See, e.g.,* Unif. R. Evid. 504(c); *McCormick, supra,* § 78. In federal courts, the marital communications privilege typically is forfeited only where both husband and wife are jointly engaged in criminal activity or where the victim is the other spouse or some other family member. *See United States v. Picciandra,* 788 F.2d 39, 43–44 (1st Cir.1986); *United States v. Mavroules,* 813 F.Supp. 115, 119–20 (D.Mass.1993).

to say that the fragments of evidence cited do not even approach misprision of felony or accessory after the fact. The government's theory would make a criminal of anyone who, as the victim of a crime or faced with a criminal threat, resisted a spousal suggestion that the police be called.

The government's underlying notion may be that the privilege is lost for any communication that plays a functional role in a crime—regardless of whether the parties to the communication are entirely innocent and otherwise protected by the privilege. On this view, the parents of a kidnapped child could be compelled to testify after the event about their intimate conversations with each other concerning the kidnapping and possible payment of a demanded ransom. It is not an attractive picture, and it is hard to believe that the suggestion is seriously intended.

■ In all events, it is not the law. Under the crime-fraud exception, we think that it takes wrongful complicity by the privilege holder, not innocent or involuntary action, to forfeit the privilege. This is so even though, as with many applications of privilege, law enforcement may be hampered in the interest of other values. The victims of kidnapping or extortion have problems enough; loss of otherwise applicable privileges is not part of the package.

■ The government's remaining argument is that Stephen Rakes himself disclosed the alleged threats to others, most importantly, to one Brian Burke. According to the government, Rakes had promised to pay Burke for construction and related work on the liquor store and owed him a substantial sum. When in early 1984 Burke called about the debt, the government says that Rakes told Burke in dramatic terms that he (Rakes) had been forced out of the business. This, says the government, shows that the information was never confidential, and, in any event, the disclosure waived the privilege.

The disclosure to Burke is weak, and to us wholly unpersuasive, evidence that the communications suppressed by the district court were never intended to be confidential. For reasons already indicated, there is every reason to think Stephen Rakes' conversations with Julie Rakes and with Sullivan were intended to be confidential. The limited disclosure to Burke, however dramatic, was obviously made to ward off a debt collection effort and not because Stephen Rakes had any interest in broadcasting information that might endanger his life.

■ The waiver issue is more complicated. Ordinarily, deliberate disclosure of a privileged communication, where no privilege protects this further disclosure, waives a communications privilege. *See United States v. MIT*, 129 F.3d 681, 684–85 (1st Cir.1997). The restriction is directed against selective disclosures by reserving protection for only those communications that the privilege holder himself is prepared to keep confidential. *SEC v. Lavin*, 111 F.3d 921, 929, 933 (D.C.Cir.1997). The restriction is one of public policy, and applies regardless of the privilege holder's subjective intent. *MIT*, 129 F.3d at 684.

As already noted, the privileged communication and the facts recounted within it are two different things. *Upjohn*, 449 U.S. at 395, 101 S.Ct. at 685. Thus, a client does not normally lose the privilege as to communications with his attorney merely because he testifies at trial to the same events discussed with his lawyer. *United States v. El Paso Co.*, 682 F.2d 530, 538–39, n. 10 (5th Cir. 1982). Here, there is no suggestion that Stephen Rakes ever told Burke or anyone else about his *communications* with Julie or with attorney Sullivan.

Nevertheless, we agree that (on a theory of waiver) a disclosure of information might be so complete as to defeat a claim of privilege. We so held in *United States v. Billmyer*, 57 F.3d 31 (1st Cir.1995), but in peculiar circumstances: the information had been collected by the attorney for the client and then voluntarily disclosed in full by the client to the government; the issue was whether this same information, already possessed by the government, should also be made available to the third parties whom the government was prosecuting.

The present case is not remotely comparable. The communications by Stephen Rakes to his wife and his attorney apparently con-

**6**

tained much that was not disclosed to Burke, whom the government can always call as a witness. Nor, in contrast to *Billmyer,* is Rakes making a disclosure to the government while trying to withhold the information from defendants whom the government is trying to prosecute. *Billmyer* is the exception, and we have no trouble letting the camel's nose into the tent without letting in the camel.

At oral argument the government accused Rakes of trying to invoke a "victim's privilege." There is, of course, no such privilege. A defense of "duress" exists but its requirements are stringent. *See* 1 W. Lafave and A. Scott, *Substantive Criminal Law,* § 5.3 (1986). In any event, the duress defense has not been invoked in this appeal and forms no part of our decision. We simply agree with the district court that the suppressed communications were originally privileged, and that there was no later loss of the privilege as claimed by the government.

The government's arguments are, as is usual in this district, presented with skill, and its zeal to pursue an alleged extortionist is understandable. But skill and zeal are to be harnessed by common sense. The notion that the Rakeses could properly be treated as participating in their own extortion is Orwellian. An appeal for which such a proposition had to be the linchpin ought never to have been brought.

*Affirmed.*