**UNITED STATES, Appellee,**

v.

**George Wayneti REEDER, a/k/a Wayne Reeder, Defendant, Appellant.**

**No. 97–1831.**

United States Court of Appeals, First Circuit.

Heard Dec. 8, 1998.

Decided March 10, 1999.

Order May 19, 1999.

---

Dennis P. Riordan, with whom Dylan L. Schaffer, Riordan & Rosenthal, Law Offices of e.robert (bob) wallach, P.C. and e. robert (bob) wallach, P.C. were on brief, for appellant.

Sangita K. Rao, Attorney, Department of Justice, with whom Margaret E. Curran, United States Attorney, and Craig N. Moore, Assistant United States Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge,
ALDRICH and CYR, Senior Circuit Judges.

TORRUELLA, Chief Judge.

Appellant, George Wayne Reeder, was charged with five counts of wire fraud, in violation of 18 U.S.C. § 1343, and five counts of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. The charges are based on five wire transfers made in June 1988. The transfers were to pay liens and costs on properties owned by Reeder which had been posted as collateral for the purchase of two insurance companies. Reeder's first trial in May 1996 resulted in a hung jury. Following a retrial in October 1996, Reeder was convicted of all ten counts. The district court sentenced Reeder to forty-six months in prison and ordered him to pay restitution in the amount of $16.5 million. In all respects, we affirm.

## BACKGROUND

■ We review the facts of a criminal case on appeal from a conviction in the light most favorable to the verdict. *See United States v. González–Maldonado,* 115 F.3d 9, 12 (1st

Cir.1997). Our presentation of the facts draws considerably on our recent opinion in *United States v. Christopher*, 142 F.3d 46 (1st Cir.1998).

In mid–1987, Charles Christopher and other investors formed a holding company called Resolute Holdings, Inc. ("Resolute") for the purpose of acquiring insurance companies. Resolute sought to acquire American Universal Insurance Company ("American"), an insurer headquartered in Providence, Rhode Island, and Diamond Benefits Life Insurance Company ("Diamond"), an insurer that was licensed in Arizona and had its principal offices in California. Resolute, however, was a shell company, with no assets except $250,000 in working capital. In late 1987, Christopher and Resolute enlisted the participation of Reeder, a California developer who had real estate holdings and controlled several companies, including Hill Top Developers ("Hill Top"). Reeder agreed to contribute capital to the insurance companies in exchange for a share in Resolute.

In early February 1988, Reeder negotiated a deal with Resolute. Under the terms of Reeder's deal with Resolute, in exchange for Reeder's capital contribution to the insurance companies, Reeder received a 60% share of Resolute and about $2 million in yearly profit participation. Reeder thus acquired a controlling interest in Resolute, although the formal transfer of Resolute shares to Reeder did not become official until June 1988.

In addition to reaching an agreement with the respective sellers of American and Diamond, Resolute had to obtain the approval of state insurance regulatory authorities. By statute, the Rhode Island Department of Business Regulation ("RIDBR") had to approve the sale of American, and the Departments of Insurance in both Arizona and California had to approve the sale of Diamond. Resolute submitted an application, known as a Form A statement, to each of those three states. Each Form A required the disclosure of extensive background and financial information about the individuals involved in the acquisition, their business plan for the company, and the financial means by which the company would be acquired, so that the regulators could assess whether the acquisition would jeopardize the interests of policyholders.

As part of its acquisition plan submitted to the insurance regulators, Resolute agreed to capitalize the insurance companies by contributing Reeder's $50 million promissory note, secured by Heritage Ranch and Indian Palms, to American. To capitalize Diamond, Resolute agreed to contribute Reeder's $12 million promissory note, secured by Indian Springs.

The acquisition of Diamond had an additional component. Resolute had negotiated for Diamond to assume a block of annuity policies from the Life Assurance Company of Pennsylvania ("LACOP"). As consideration for its assumption of about $31 million in LACOP's annuity obligations, Diamond was to receive about $29.4 million in cash from LACOP. Of that sum, $18 million was to be delivered to Diamond at closing, with the remainder to follow several months later.

At the time of Resolute's Form A applications, all of the Reeder properties securing Reeder's promissory notes—Heritage Ranch, Indian Palms, and Indian Springs—had extensive liens on them. On Heritage Ranch and Indian Palms alone, the total was about $17 million. Those preexisting liens were significant because they meant that American's and Diamond's security interests would be subordinated to other mortgages on the properties. In addition, pre-existing liens on the collateral decreased the value of the promissory notes, thereby decreasing the amount of capital with which the insurance companies could do business.

In February 1988, Reeder made a deal with Christopher that Resolute would purchase Reeder's liens from the banks so that the closings could go forward. Reeder and Resolute made repeated representations to the insurance regulators that the pre-existing liens on the Reeder properties would be cleared by closing. At the same time that these representations were being made, however, Reeder was repeatedly advised that Resolute had no means by which to pay the debt.

In the Form A filings submitted to Rhode Island, Arizona, and California, Resolute rep-

resented that all pre-existing liens on the collateral securing its promissory notes to the insurance companies would be discharged at or before closing on Resolute's acquisition.

On March 10, 1988, Arizona approved Resolute's acquisition of Diamond. Resolute understood that, by Diamond's closing, it still had to provide documentation demonstrating that the pre-existing liens on the property securing the notes to Diamond had been cleared.

The Rhode Island regulators were particularly concerned about the encumbrances on the property securing the promissory note to American. In late April, RIDBR chief legal counsel Nancy Mayer wrote to Resolute asking whether Reeder's corporations owned Heritage Ranch and Indian Palms "free and clear of all encumbrances."

Reeder later admitted that he knew that the liens would not be paid off by the closings on the insurance companies, despite the representations to the regulators. Nevertheless, Reeder was still actively involved in the acquisition of the insurance companies. On May 24, Reeder had a meeting with Christopher and several other Resolute principals to decide who was going to run the insurance companies. Reeder, soon to be the majority shareholder of Resolute, had the ultimate authority to make that decision. Against the strong opposition of the other Resolute principals, Reeder placed Christopher in charge of the insurance companies.

The RIDBR scheduled an approval hearing on the American acquisition for May 26. On May 24, just two days prior to that hearing—when Reeder knew that the American closing was imminent—Reeder signed a number of documents relating to the purchase of American, including a capitalization agreement that was submitted to the RIDBR as part of the Form A application. In the capitalization agreement, Reeder represented that, "[t]here are no actions, suits or proceedings, pending or threatened, to the current actual knowledge of the Makers, effecting [*sic*] the $50 Million Note or any portion of the property, at law or in equity or before or by any federal, state, municipal or other governmental department, commission, [or] board." This statement was not true. Reed-

er knew that suits were threatened against both Heritage Ranch and Indian Palms, the two properties securing the $50 million promissory note to American.

At the time Reeder signed the capitalization agreement, Reeder had a $10 million note outstanding with Continental Bank, secured by Heritage Ranch. Reeder had missed a $2.3 million amortization payment due in October 1987. In a meeting with Continental in December 1987, Reeder told the bank that he did not have the cash to meet his obligations under the loan. On March 11, 1988, Continental notified Reeder that he was in default and that the bank might institute foreclosure proceedings. On April 29, Continental demanded full payment on the loan, and on June 3, 1988, Continental filed for foreclosure on Heritage Ranch.

Reeder was also delinquent on several loans he had outstanding with Home Federal Bank ("Home Fed"). Reeder owed Home Fed more than $7 million for loans that were secured by both Heritage Ranch and Indian Palms, and he had not made payments on certain loans since June 1987. On May 12, Home Fed demanded payment in full on one of the loans secured by Heritage Ranch.

On May 26, 1988, Rhode Island held the approval hearing on the proposed acquisition of American by Resolute. Resolute maintained its position that it would pay off the pre-existing liens on the Reeder properties securing the promissory note by closing. Indeed, at some point that day, although not at the formal hearing, RIDBR Chief Counsel Mayer was told that the pre-existing liens on the Reeder properties had been cleared.

On May 27, 1988, the RIDBR issued a conditional order approving Resolute's acquisition of American. Although the transaction closed that day, the order made clear that the transfer of ownership would not become final until Resolute submitted final title insurance policies for Heritage Ranch and Indian Palms "to be effective as of the closing date which indicat[e]" that "all mortgages, deeds of trust and the like have been paid in full and discharged." On June 7, 1988, California issued an order approving Resolute's acquisition of Diamond, which Arizona had

already approved on March 10. The extensive liens on Heritage Ranch, Indian Palms, and Indian Springs were not paid off by May 27, when the American purchase closed, nor by June 14, when the Diamond purchase closed.

On May 28, 1988, Christopher told Reeder that the regulators had approved the American acquisition. A few days later, Reeder and Christopher had a private meeting to discuss the acquisitions at Reeder's office in California. Christopher confirmed that the liens on Reeder's properties had not yet been discharged. Reeder became angry when Christopher informed him that the Rhode Island regulators had amended the release clause provision of Reeder's promissory note to American.

The release clause governed the rate at which Reeder had to pay down the balance on the $50 million promissory note to American if he sold portions of the properties securing the note. Under the original provision, Reeder was required to pay American only 110% of the appraised value of each lot sold, even though the lots could be sold for a price considerably higher than the appraised value. Under the amended release clause, all monies received from the sales of portions of the properties securing the note had to be applied to reducing the principal balance of the note. Reeder could not receive any monies from the sale of the lots until the $50 million note had been paid off in its entirety. Nor could Reeder take money from the insurance companies for development costs associated with Heritage Ranch or Indian Palms. Reeder found the amended release clause to be "untenable," because it deprived him of the steady cash flow he had expected from the sale of lots at Heritage Ranch and Indian Palms.

Reeder arranged with Christopher, in an oral agreement with no documentation, for an $18 million "loan" to Hill Top. The "loan" was to be secured by Windbrook Country Club, yet another of Reeder's properties, which was worth only $3 million. Although Reeder later said that, he expected that Resolute would be the entity loaning Hill Top funds under the Windbrook "loan," Reeder knew that Resolute had no assets except the insurance companies. Reeder also knew that, upon Resolute's acquisition of Diamond, Diamond was to receive the LACOP annuity money, the first installment of which was in the amount of $18 million—the same amount as the Windbrook loan.

On June 13, Reeder signed the documents for the Windbrook loan. Under the terms of the Windbrook loan, Diamond—not Resolute—agreed to lend Hill Top up to $18 million to pay off liens on Heritage Ranch, Indian Palms, and Windbrook Country Club. The documents were dated June 15, 1988— the day after the expected Diamond closing.

The Windbrook loan violated state regulatory requirements. Under Arizona insurance regulations, Diamond could not advance loan proceeds in an amount greater than the value of the collateral backing the loan. In addition, it could not invest more than 10% of its assets in a single investment. No waiver was requested or received for the $18 million Windbrook loan. In addition, the insurance regulators required that the money to pay off the liens come from an external source.

After Reeder's private meeting with Christopher about the Windbrook loan, Reeder began settlement negotiations with Continental and Home Fed over his outstanding loan obligations. On June 7, Reeder reached a settlement with Continental for a "discounted note payoff" in which Reeder agreed to pay off his $10 million note to Continental for about $8.7 million. Reeder arranged for the payment to be due on June 16—two days after the anticipated Diamond closing.

On June 10, Resolute shareholders met in Dallas, Texas for their first meeting. One of Reeder's attorneys, Arthur Karma attended the meeting as a proxy for Reeder, the controlling shareholder. Pursuant to Reeder's instructions, Karma voted to make Christopher a director of both insurance companies, as well as the new President of American and the CEO of Diamond. In addition, Reeder had twice instructed Karma to make certain that Christopher paid off the Continental loan, which Reeder had settled a few days earlier. Karma related Reeder's message to Christopher, and Christopher said the liens would be paid in the next few days.

Unbeknownst to Colleen Comey, the President of Diamond, on June 13, the day before the closing on Diamond, Christopher directed Keith Bell, an employee of American, to open an account in Diamond's name at Fleet Bank in Providence, Rhode Island. On June 15, the day after Diamond's closing, Christopher directed Bell to have LACOP transfer the first installment of $18 million owed to Diamond to the Fleet Bank account.

Once the $18 million was deposited in the Fleet Bank account, Christopher directed Bell to make a series of wire disbursements. Five of those transfers were pursuant to Reeder's directions and for Reeder's benefit.

On June 16, Reeder caused $8.7 million to be sent from the Diamond account to Continental Bank in Chicago, per the settlement he had reached with the bank on June 7. This payment extinguished the most substantial pre-existing lien on Heritage Ranch.

Also on June 16, 1988, Reeder caused $465,000 to be transferred to an account of the Burrillville Land Company in Santa Monica, California. Reeder had no interest in that company or its accounts. Burrillville, however, was managed by Carlsberg Management, which was closely associated with Reeder's businesses. Then, on June 17, through written instructions, Reeder had the account manager, Theresa DeLeon, allocate the $465,000 into three separate checks for $100,000, $315,000, and $50,000, all payable to Hill Top.

On June 23, 1988, Reeder caused $825,000 to be transferred to the client trust account of James Patison, the lawyer who had negotiated the Home Fed settlement for Reeder. Reeder stated that this $825,000 transfer, which he discussed with Christopher at their private meeting in early June, involved payments to Reeder of funds he felt he was owed by Home Fed in connection with two joint ventures Home Fed and Reeder had engaged in: Whimpy Gentry and Rancho 187. Reeder's settlement agreement with Home Fed, however, stated that it resolved all disputes between the parties, including those two matters. Reeder admitted that the insurance companies were wholly unrelated to those two projects. Reeder also admitted that the $825,000 transfer represented a portion of the discount he was able to negotiate in his settlement with Home Fed.

On June 23, 1988, Reeder caused $459,000 to be transferred to Carlsberg Management. As with the earlier transfer to Burrillville, Reeder gave DeLeon written instructions on how to disburse the funds. The same day the funds were received, DeLeon cut two checks: one for $384,000 payable to Hill Top, and one for $75,000 payable to a Reeder intercorporate account. Reeder stated that this wire transfer, as well as the prior June 16 transfer of $465,000, represented the approximately $1 million discount he had negotiated on his outstanding debt with Continental Bank. Reeder also admitted that he had made an agreement with Christopher at their early June meeting to take these amounts, as compensation for the amended release clause, for development costs at Heritage Ranch—a use that was prohibited by the regulators.

Reeder had signed the settlement agreement with Home Fed on June 22, which required him to pay Home Fed approximately $5.9 million. The Diamond account at Fleet Bank, however, had been nearly exhausted by this time and did not have sufficient funds to cover that amount. Therefore, $3 million was transferred to Diamond's Fleet account from an American account without any justification or supporting documentation.

Then, on June 24, 1988, Reeder caused approximately $5.9 million to be transferred from the Fleet account to Home Fed in payment of Reeder's obligations to that bank.

The total amount taken from the insurance companies for Reeder's benefit was approximately $16.5 million, consisting of $13.5 million taken from Diamond and $3 million taken from American.

By August 1988, Colleen Comey, Diamond's President, had become concerned about the whereabouts of the LACOP money. At that point, as annuity holders attempted to cash in their policies, Diamond was writing checks that were returned for insufficient funds. When Comey began inquiring whether the LACOP money had been

received, she learned that it was gone. In trying to determine how the money had been spent, she was unable to reconstruct the transactions. Finally, after failing to receive an adequate explanation from Christopher, Comey called Reeder to report her concerns about the missing $18 million and make further inquiries. Reeder expressed no surprise at all when Comey informed him of the missing $18 million, but he gave her no information about the missing money, simply telling her to speak to Christopher or William Geary, another Resolute principal. On September 22, 1988, concerned that the second installment of $10 million soon due from LA-COP would likewise disappear, Comey froze the Fleet account and alerted regulators. The next day she was fired.

## DISCUSSION

### I. Sufficiency of the Evidence

■ When a defendant challenges his criminal conviction, claiming that the government failed to present sufficient evidence to prove the defendant guilty of the charged crime, the court must "view the evidence, together with all reasonable inferences that may be drawn therefrom, in the light most favorable to the government," *United States v. Campa,* 679 F.2d 1006, 1010 (1st Cir.1982), and while so doing, must ask whether "a rational trier of facts could have found guilt beyond a reasonable doubt." *United States v. Ingraham,* 832 F.2d 229, 239 (1st Cir. 1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). The court must apply this standard both to direct and to circumstantial evidence; "[c]ircumstantial evidence is intrinsically no different from testimonial evidence, and is entitled to similar weight." *United States v. Van Helden,* 920 F.2d 99, 101 (1st Cir.1990) (citations omitted). Thus, the government may use circumstantial evidence to prove its case. However, the total evidence, with all reasonable inferences made in the light most favorable to the government, must be such that a rational trier of fact could have found guilt beyond a reasonable doubt. *See United States v. Mena,* 933 F.2d 19, 23 (1st Cir. 1991). Furthermore, the government need not present evidence that precludes every

reasonable hypothesis inconsistent with guilt in order to sustain a conviction. *See United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986). Rather, the jury is at liberty to select freely among a variety of reasonable alternative constructions of the evidence. *See United States v. Smith,* 680 F.2d 255, 259 (1st Cir. 1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983).

### A. Wire Fraud

■ Reeder argues that his wire fraud convictions cannot stand because there is no evidence in the record that he knew that Christopher's assurances concerning the liens were false, much less that he shared Christopher's intent to deceive and defraud the regulators. *See* Defendant's Br. at 21. We find his argument unpersuasive.

■ To prove wire fraud, the government must establish beyond a reasonable doubt: (1) the defendant's knowing and willing participation in a scheme or artifice to defraud with the specific intent to defraud; and (2) the use of interstate wire communications in furtherance of the scheme. *See United States v. Sawyer,* 85 F.3d 713, 723 (1st Cir. 1996).

Reeder challenges only the intent element. He concedes that Resolute and Christopher made numerous representations to the regulators that the liens on Reeder's properties would be paid off by closing. He also admits that Christopher made these misrepresentations with the intent to deceive as part of a scheme to defraud the insurance regulators. Reeder's argument is that the evidence does not demonstrate that he knew those representations to be false because he allegedly believed that Resolute would pay off the liens.

At trial, Reeder testified that he did not expect that the liens would be paid off by closing, and that he did not think that Resolute would pay off the liens before closing. Reeder's own testimony provided evidence that, despite the repeated representations made to the insurance regulators that the pre-existing liens on his properties would be

cleared by closing, Reeder knew that the liens would not be discharged at that time.

Furthermore, Reeder was the de facto majority shareholder of Resolute. He admitted that the huge amount of money he was fronting for the insurance companies was too much to be put at risk without control of Resolute. Although Reeder did not formally receive his shares in Resolute until June 1988, the jury was entitled to infer that he was the one making decisions for Resolute before that time, as he was on May 24 when he placed Christopher in charge of the insurance companies. The evidence further showed that Reeder kept in close and direct contact with Christopher throughout the acquisition process, and Jarrell Ormand, Resolute's lawyer in Texas, communicated with Reeder in responding to inquiries from the RIDBR. From this evidence, the jury could infer that Reeder was intimately involved with Resolute's effort to acquire the insurance companies and responsible for the representations made to the regulators on behalf of Resolute that the liens on his properties would be cleared by closing.

The evidence also demonstrated that Reeder knew that Resolute had no means by which to pay off the liens. In letters on March 11, May 13, and May 20, Karma and his law partner, David Bence, informed Reeder of their increasing concern over Resolute's failure to make any arrangements to discharge the debt. Reeder, however, ignored their pleas for a meeting, and instead made his own false representation to the regulators that no suits were threatened against the properties backing his promissory note to American, even though two banks were about to initiate foreclosure proceedings. From this sequence of events, the jury could reasonably infer that Reeder was aware of the fact that the liens on his properties would not be paid off by closing, and that he intended to deceive the regulators when he and Resolute made the repeated representations that his properties would be unencumbered upon Resolute's acquisition of the insurance companies. *See United States v. Cassiere*, 4 F.3d 1006, 1024 (1st Cir.1993) ("Guilty knowledge may be inferred where instances of fraud are repeatedly brought to

a defendant's attention without prompting alteration of his facilitative conduct.") (quotation omitted).

In support of his assertion that he believed that Resolute would discharge his liens, Reeder relies primarily on statements made by him, his corporations, or Christopher and his agents that Resolute would pay off the liens. The simple fact that those statements were made, however, does not prove that Reeder believed them. Moreover, the jury was entitled not only to disbelieve Reeder's statements, but also "[to] legitimately ... presume[ ] that the fabrication[s] w[ere] all the more proof of [his] guilt." *United States v. Jiménez–Pérez*, 869 F.2d 9, 10 (1st. Cir. 1989).

Reeder's participation in making misrepresentations to the regulators, his use of the wires to divert $16.5 million of the insurance companies' funds, and his fraudulent efforts to conceal his actions overwhelmingly establish his intentional participation in the scheme to defraud. Based on this evidence, a rational trier of fact could easily have found guilt beyond a reasonable doubt.

## B. Interstate Transportation of Stolen Property ("ITSP")

Reeder contends that his ITSP convictions must be overturned because the government failed to prove that he knew that the property was taken by fraud. We disagree.

To convict on the five ITSP counts, the jury had to find that Reeder transported in interstate commerce $5,000 or more that he knew to have been stolen, converted, or taken by fraud. *See Dowling v. United States*, 473 U.S. 207, 214, 105 S.Ct. 3127, 87 L.Ed.2d 152 (1985) (stating the elements of 18 U.S.C. § 2314). Reeder agrees that Christopher engaged in a scheme to defraud, and, as explained above, the evidence demonstrates that, after the insurance companies were acquired, Reeder entered into an agreement with Christopher to divert $16.5 million of the insurance companies' funds for his own purposes and structured the transactions to conceal his activities. Based on that evidence alone, the jury could reasonably infer

that Reeder knew that the money he transported had been taken by fraud.

## II. Government's Closing Argument

■■■■ Reeder argues that his convictions must be reversed because the government's closing argument misled the jury into finding guilt based on conduct not amounting to fraud. At trial, Reeder did not object to any portion of the prosecutor's closing argument. Therefore, his claim is reviewed only for plain error. *See United States v. Young*, 470 U.S. 1, 6, 14–15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

Reeder contends that the prosecutor argued that the jury could convict Reeder of wire fraud based: (1) on his admission that he took $1 million from the insurance companies in response to the amended release clause; (2) on his violation of a state regulation by failing to secure a waiver from Arizona for the Windbrook loan; or (3) on his failure to comply with the Windbrook contract terms by taking money for purposes other than the discharge of liens. Reeder contends that such proof would be insufficient to sustain his convictions because it would not constitute "a fraud in obtaining the property." Defendant's Br. at 30.

Contrary to Reeder's assertions, the government did not argue to the jury that it could convict Reeder of fraud if it found simply that he had taken $1 million from the insurance companies, violated a state regulation, or disregarded the loan terms.

■■■■ We consider the prosecutor's comments within the framework and context of the entire case. *See United States v. Morales–Cartagena*, 987 F.2d 849, 854 (1st Cir. 1993). Evidence at trial demonstrated that Reeder: (1) admitted that he took $1 million from the insurance companies; (2) failed to disclose or secure a waiver from the state regulators for the Windbrook "loan" despite his knowledge that insurance company transactions were subject to strict oversight; and (3) took money from the insurance companies for purposes unrelated to the business of the insurance companies and not covered by the terms of the Windbrook "loan."

In his closing argument, the prosecutor argued that this evidence, in the context of and in combination with other evidence, demonstrated Reeder's knowing participation in the fraudulent diversion of insurance company assets and his intent to defraud. *See, e.g., United States v. Woodward*, 149 F.3d 46, 62 (1st Cir.1998) (violation of state law probative of intent to deceive in mail fraud case); *see id.* at 57 ("The jury was entitled to infer [defendant's] intent from the circumstances surrounding his actions, from indirect, as opposed to direct, evidence.") (quotation omitted); *see also United States v. Tajeddini*, 996 F.2d 1278, 1282 (1st Cir.1993) ("[T]he prosecutor is entitled, in closing, to ask the jury to draw warrantable inferences from the evidence admitted during trial.").

There is no reason to believe that the jury erroneously concluded that it could convict simply because Reeder violated a regulatory order or breached a contract. Defense counsel repeatedly warned the jury that Reeder was "not on trial for violating a conditional order" or "for violation of a state statute." They further informed the jury that "[t]his is not a breach of contract case," and that the jury had to decide whether Reeder "knowingly and willfully obtain[ed] the money through deceit or fraud." Furthermore, the trial court's instructions cured any alleged error in the closing argument. The court correctly instructed the jury on the elements of the offense for both the wire fraud and the ITSP counts. The court specifically instructed the jury that "[t]he violation of an insurance regulatory order or state law is not itself a federal crime."

## III. Variance

■■■■ Reeder argues that the alleged theories of conviction offered by the prosecution in its closing argument varied from the theory of conviction alleged in the indictment. Specifically, he contends that the government urged the jury to convict on what he terms "non-fraud" theories: (1) the admission that Reeder took $1 million; (2) the failure to get a waiver for the Windbrook loan; and (3) the failure to comply with the contract terms. He urges this Court to reverse because these "non-fraud" theories of conviction varied

from the theory of fraud charged in the indictment. Reeder argues that his rights were substantially affected by the alleged variance because the jury was allowed to convict on a theory insufficient to constitute the federal crime of wire fraud. Reeder's variance argument is simply a restatement of his claim that the jury may have convicted him on a legally insufficient theory based on the government's closing argument. Couched in different terms, it is still unconvincing.

■ A variance occurs when the proof at trial paints a portrait that differs materially from the scenario detailed in the indictment. *See United States v. Vavlitis*, 9 F.3d 206, 210 (1st Cir.1993). A variance requires reversal of a conviction only if it is both material and prejudicial, for example, if the variance works a substantial interference with the defendant's right to be informed of the charges. *See Vavlitis*, 9 F.3d at 210. When, as here, the indictment gives a defendant particular notice of the events charged, and the proof at trial centers on those events, minor differences in the details of the facts charged, as contrasted to those proved, are unlikely to be either material or prejudicial.

There was no variance between the evidence presented at trial and the indictment. The proof at trial is necessarily more detailed than the facts alleged in the indictment, which is simply a "plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R.Crim.P. 7(c)(1). The indictment charged a scheme to defraud encompassing the acquisition of insurance companies and the diversion of the companies' assets. Paragraphs 28 to 44 of the Redacted Indictment discuss the fraudulent activity undertaken after the acquisition of the insurance companies, and specifically refer to the Windbrook loan. *See* RI ¶¶ 36–38. To the extent that: (1) the admission concerning taking $1 million because of the amended release clause; (2) the failure to secure a waiver for the Windbrook loan; and (3) the failure to comply with the Windbrook loan terms were not specifically detailed in the indictment, these facts did not materially vary the nature of the charged fraudulent scheme.

No prejudice resulted because Reeder was not deprived "of sufficiently specific information to prepare a defense, unfairly surprise[d] ... at trial, or isolate[d] ... from the constitutional protection against double jeopardy." *United States v. Fermin Castillo*, 829 F.2d 1194, 1197 (1st Cir.1987).

## IV. Unanimity

■ Reeder argues that the district court erred in failing to instruct the jurors that they had to unanimously agree on "the theories and acts of fraud" underlying their guilty verdict. We find no such error.

■ In *Schad v. Arizona*, the Supreme Court held that, in returning general verdicts in cases in which the government has alleged in a single count that the defendant committed the offense by one or more specified means, jurors are not required to agree upon a single means of commission. *See* 501 U.S. 624, 631, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion); *id.* at 649, 111 S.Ct. 2491 (Scalia, J., concurring in part and concurring in the judgment) (explaining that, for example, where "a woman's charred body has been found in a house, and there is ample evidence that the defendant set out to kill her," the jury does not have to agree on whether defendant "strangled victim to death," or "left her unconscious and set the fire to kill her"). While a jury must agree on all of the elements of an offense, it need not agree on the means by which all the elements were accomplished.

Here, the jury was instructed that one of the elements of the wire fraud counts was the defendant's knowing participation in a scheme to defraud. The government alleged and proved a single scheme to defraud. While the jurors had to unanimously agree that Reeder knowingly participated in a scheme to defraud—an element of the crime—they did not, contrary to Reeder's contention, have to unanimously agree on each piece of evidence offered to prove Reeder's participation.

## V. Attorney–Client Privilege

■ At trial, Reeder objected to the district court's admission of Karma's testimony

about his 1991 conversation with Reeder, during which Reeder asked for Karma's help in covering up his use of insurance company money. The district court found that Karma's testimony was not protected by the attorney-client privilege on two bases. First, the court determined that the conversation was admissible under the crime-fraud exception to the attorney-client privilege. Second, the court determined that Reeder had waived the attorney-client privilege by failing to object to Karma's extensive prior testimony about his communications with Reeder relating to the insurance company transactions. We agree with the district court that Reeder's conversation with Karma was admissible under the crime-fraud exception.

The importance and sanctity of the attorney-client privilege is well established. *See Upjohn v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Because it " 'withhold[s] relevant information from the factfinder,' " *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citation omitted), the " 'attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud.' " *Motley v. Marathon Oil Co.,* 71 F.3d 1547, 1551 (10th Cir.1995) (quoting *In re Grand Jury Proceedings (Company X) v. U.S.,* 857 F.2d 710, 712 (10th Cir.1988)). "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Zolin,* 491 U.S. at 563, 109 S.Ct. 2619 (citations omitted). "Thus, *the attorney-client privilege is forfeited* inter alia *where the client sought the services of the lawyer to enable or aid the client to commit what the client knew or reasonably should have known to be a crime of fraud.*" *United States v. Rakes,* 136 F.3d 1, 4 (1st Cir.1998) (emphasis added).

 In order to successfully invoke the crime-fraud exception, the government must make a prima facie showing that the attorney's assistance was sought in furtherance of a crime or fraud. *See In re Grand Jury Subpoenas ("Subpoenas"),* 144 F.3d 653, 660 (10th Cir.1998); *United States v. de la Jara,* 973 F.2d 746, 748 (9th Cir.1992). A district court's determination to admit evidence under the crime-fraud exception is reviewed for abuse of discretion. *See Subpoenas,* 144 F.3d at 659; *In re Grand Jury Proceedings,* 102 F.3d 748, 751 (4th Cir. 1996); *In re Sealed Case,* 754 F.2d 395, 399–400 (D.C.Cir.1985). The facts underlying the district court's decision on the crime-fraud exception are reviewed for clear error. *See United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir.1997).

The record demonstrates that, in their 1991 conversation, Reeder told Karma that he had "a problem" with some of the insurance company transactions. Reeder then admitted that he had taken more than $1 million from the insurance companies, and handed Karma a document indicating that more than $1 million from the insurance companies had not been properly applied. Thereafter, Reeder stated that he could explain how he had used the money. After reviewing the transactions, Karma said, "This won't work. The monies that were sent by American Universal were for work that had been performed for liens that were already on the property." Reeder responded, "No problem. 'I can get my friends to write new invoices and we'll pay them as of 1988.' " Karma told Reeder that to do so would be asking 20–30 people to commit fraud, that he did not want any part of it, and he advised Reeder not to do it. Reeder then stated, "I thought maybe you could come up with some idea." Karma once again refused to help Reeder cover up the transactions, responding, "Wayne, it's a crime. I don't want anything to do with it. Don't ever discuss it with me again." The district court's determination that the government made a prima facie showing that Reeder solicited Karma's assistance to cover up his criminal conduct was not an abuse of discretion. Reeder sought Karma's services to enable him to commit what he knew or reasonably should have known to be fraud. *See Rakes,* 136 F.3d at 4.

Reeder argues that the crime-fraud exception does not apply because he was simply asking Karma's advice about whether he could solve a problem in a particular manner.

The record belies Reeder's assertion. Reeder did not merely ask Karma whether backdating invoices would be illegal, which would be equivalent to Reeder's hypothetical about "the head of a corporation asking his counsel if he can condition a campaign contribution to a politician on the politician's promise to support legislation." Here, Reeder twice asked for Karma's help in a cover-up of Reeder's fraudulent diversion of the insurance companies' money. *See Subpoenas,* 144 F.3d at 660 ("The exception does not apply if the assistance is sought only to disclose past wrongdoing, . . . but it does apply if the assistance was used to cover up and perpetuate the crime or fraud."). Therefore, the district court did not abuse its discretion in admitting Karma's testimony under the crime-fraud exception.

Because we hold that the conversation was admissible under the crime-fraud exception, there is no need to reach the waiver issue.

## VI. Evidentiary Rulings

 Reeder challenges several of the district court's evidentiary rulings. We review a district court's rulings on admissibility and relevance for abuse of discretion. *See Cassiere,* 4 F.3d at 1018. Under Fed.R.Evid. 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of prejudice, confusion of the issues, or misleading the jury. This Court grants the trial court "especially wide latitude" when Rule 403 balancing is the subject of review. *See United States v. Rivera–Gómez,* 67 F.3d 993, 996 (1st Cir.1995). "[O]nly rarely—and in extraordinary circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Williams v. Drake,* 146 F.3d 44, 47 (1st Cir.1998) (quotation omitted).

 First, Reeder argues that the district court erred in excluding testimony from Karma and Reeder that the Windbrook loan was restructured to substitute Resolute for Diamond as the payor. The crime was completed when Reeder made the wire transfers in June 1988, thereby diverting the insurance companies' funds for his own purposes. Evidence of elaborate accounting transactions undertaken after June 1988 to restructure the Windbrook loan are irrelevant to Reeder's state of mind at the time that he misappropriated the $16.5 million. In any event, any error in the exclusion was harmless because the district court allowed both Reeder and Ormand to testify that the Windbrook loan was rebooked as a loan from Resolute. *See United States v. Brown,* 938 F.2d 1482, 1488 (1st Cir.1991) (any error in the exclusion of evidence is rendered harmless where "defendant's theory . . . was manifested to the jury through testimony which was allowed").

 Second, Reeder challenges the district court's exclusion of notes taken by Bence, Karma's law partner, during a June 13, 1988, conversation with Ormand, to the effect that Ormand did not think that the Windbrook loan violated state insurance laws. This evidence was inadmissible because Reeder failed to lay a proper evidentiary foundation. Reeder sought to introduce this exhibit through Karma. Karma testified, however, that he did not know what Bence discussed with Ormand that day. Reeder thus sought to introduce "Mr. Ormand's opinion as expressed to Mr. Bence as recorded by Mr. Bence on a paper that's in this witness's [Karma's] file," about a conversation that Karma had already testified he knew nothing about. The district court suggested that the document might be admissible through Ormand, that defense counsel could offer it through Bence, or that Reeder could testify about it. Reeder did not pursue any of these avenues. Consequently, the district court did not abuse its discretion in determining that this document could not be introduced through Karma.

 Third, Reeder argues that the district court erroneously excluded evidence demonstrating that various people knew about the Windbrook loan. Reeder sought to introduce through Durfee, American's Chief Financial Officer, a letter that Durfee wrote to Ormand referring to the documents that were required in order to make certain booking entries at American regarding the restructuring of the Windbrook loan. The gov-

ernment objected based on relevance. The court queried where the original documents supporting the book entries referred to in the letter were, and defense counsel stated that he did not have them. The court then excluded the exhibit on the basis that this evidence was "secondary at best" and explained, "I think we need something a little better." The court also stated, "Certainly, you can ask this witness if he has a recollection if this was recorded on the books." Defense counsel failed to ask that question. The district court did not abuse its discretion in ruling that Reeder had failed to lay a proper foundation for the admissibility of the Durfee letter by failing to produce the documents that would support the accounting entries discussed in the letter.

Later, Reeder sought testimony from Durfee as to whether the Windbrook loan was restructured so that it became a receivable of Resolute rather than Diamond. As discussed above, the district court did not exceed its discretion in determining that the relevance of that testimony was substantially outweighed by the confusion it would bring to the case. Moreover, Durfee was allowed to testify that he was aware of the Windbrook loan and of the wire transfers from Diamond's account at Fleet Bank, thereby supporting Reeder's defense that many people were aware of the loan.

On re-cross examination of Ormand, Reeder sought to introduce an August 9, 1988, letter Ormand sent to one of Resolute's other lawyers that discussed some of the transactions involved in the restructuring of the Windbrook loan. Ormand testified that he did not know if a copy was mailed to Comey, Diamond's President, but that a copy "probably was sent" to her. Comey had testified that she did not remember receiving the letter. The district court sustained the government's objection that the letter was inadmissible hearsay and irrelevant. Reeder argues that this evidence would have demonstrated that Diamond executives were aware of the restructuring, and would have refuted Comey's prior testimony that she had difficulty obtaining information about the whereabouts of the LACOP money.

The district court's ruling was proper. First, the document was inadmissible hearsay with respect to the facts contained within it. Second, the document was not admissible to impeach Comey, because Reeder failed to establish a proper foundation that the letter was even sent to Comey, let alone whether she received it. Third, the district court's decision that the evidence was outside the limited scope of a re-cross examination was not an abuse of discretion. Fourth, the district court's decision that evidence relating to the details of the restructuring was irrelevant was not an abuse of discretion.

Finally, Reeder sought to introduce notes Ormand took during a March 1988 conversation with Susan Gallinger, Resolute's local counsel in Arizona, in which they discussed the feasibility of having Diamond purchase the liens. The court properly sustained the government's objection that the notes were inadmissible hearsay. Reeder does not even attempt to argue that the district court's ruling was erroneous. Nor does Reeder explain how this evidence was relevant to demonstrating that regulators or insurance company executives were aware of the Windbrook loan, or how the exclusion of this evidence affected his defense. Thus, the evidence was properly excluded.

Contrary to Reeder's assertion, the district court's evidentiary rulings taken together did not amount to a Sixth Amendment violation eviscerating his defense. Under the Constitution, a defendant "does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)); *United States v. Kepreos*, 759 F.2d 961, 964 (1st Cir.) (same), *cert. denied*, 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985). The district court's rulings were proper and within its discretion.

## VII. Sentencing Issues

Reeder was sentenced under Guideline § 2F1.1 of the 1988 Sentencing Guidelines

Manual. His base offense level was 6. The court imposed an 11–level upward adjustment because the amount of loss involved exceeded $5 million. In imposing the upward adjustment, the district court found that the loss in this case was $16.5 million, the money Reeder had Christopher divert from the Fleet Bank account for Reeder's benefit. The court added two more offense levels because the offense involved more than minimal planning or a scheme to defraud more than one victim, and imposed a four-level role in the offense enhancement. As a result, Reeder's total offense level was determined to be 23. Reeder was assigned to Criminal History Category I, resulting in a guidelines range of 46–57 months. The district court sentenced him to 46 months of imprisonment. Reeder argues that the district court: (1) incorrectly calculated the amount of the loss; and (2) incorrectly imposed a four-level role in the offense enhancement. Neither argument is persuasive.

### A. Loss calculation

 Reeder challenges the district court's loss calculation. He argues that the $16.5 million figure cannot be used in calculating his offense level because the government argued in the *Christopher* case that Christopher alone was responsible for that loss.

Under the Guidelines, loss is the "value of the property taken." U.S.S.G. § 2B1.1 comment. 2 (1988) (cross-referenced from § 2F1.1). After adding 11 levels to Reeder's base offense level because the amount of loss exceeded $5 million, the court declined to grant a downward departure based on Reeder's argument that the loss amount overstated the seriousness of his offense because Christopher contributed to the loss.

 "[T]he victim loss table in § U.S.S.G. 2F1.1(b)(1) presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court." *United States v. Gregorio,* 956 F.2d 341, 346 (1st Cir.1992). Any portion of the total loss sustained by the victim as a consequence of factors extraneous to the defendant's criminal conduct is not deducted from total "victim loss" prior to the determination of the applicable guideline sentencing range pursuant to § U.S.S.G. 2F1.1(b)(1). *See id.* at 347 ("victim loss" table encapsulates "heartland" sentencing formula for reflecting approximate total "victim loss" in the guideline sentencing range). Rather, whatever distortive effects extraneous causes may have had on the total "victim loss" calculation may warrant a departure from the applicable guideline sentencing range. *See* § U.S.S.G. 2F1.1, comment. (n. 10) ("downward departure may be warranted" where "total dollar loss that results from the offense may overstate its seriousness," which "typically occur[s]" when defendant's fraud "is not the sole cause of the loss"); *United States v. Kopp,* 951 F.2d 521, 531 (3d Cir.1991) ("To the extent actual loss had other, more proximate causes, a discretionary downward departure—but not a mandatory 'loss' adjustment—might be appropriate.").

 We lack jurisdiction to review the district court's decision not to depart downward under the long-standing rule that "a criminal defendant cannot ground an appeal on a sentencing court's discretionary decision not to depart below the guideline sentencing range." *United States v. Pierro,* 32 F.3d 611, 619 (1st Cir.1994), *cert. denied,* 513 U.S. 1119, 115 S.Ct. 919, 130 L.Ed.2d 799 (1995); *see generally, United States v. Tucker,* 892 F.2d 8, 9 (1st Cir.1989) (holding that the defendant may not appeal a district court's decision not to depart downward).

Reeder attempts to circumvent the limitations on this Court's review of departure decisions by recasting his argument as an attack on the loss amount used in calculating the adjusted offense level. This Court has clearly held, however, that

[a]ny portion of the total loss sustained by the victim as a consequence of factors extraneous to the defendant's criminal conduct is not deducted from total "victim loss" prior to the determination of the applicable guideline sentencing range .... Rather, whatever distortive effects extraneous causes may have had on the total "victim loss" calculation may warrant a

departure from the applicable [guideline range].

*United States v. Shattuck,* 961 F.2d 1012, 1016–17 (1st Cir.1992). Thus, Reeder's argument that the district court erred in failing to consider other causes, such as Christopher's participation, for the loss in calculating Reeder's adjusted offense level is incorrect as a matter of law.[1]

■ Second, Reeder argues that the loss amount attributed to him should be offset by the property that was eventually forfeited to the insurance companies. That contention is foreclosed by our decision in *Christopher.* As we stated there: "To reduce the loss by the value of the foreclosed collateral ... would double count: the insurance companies were entitled to the protection of lien-free collateral without having to reduce their own capital in order to pay off the liens." *Christopher,* 142 F.3d at 55. Thus, Reeder's effort to distinguish himself from Christopher on the basis that Reeder contributed properties to the companies is unavailing. If not for Reeder's diversion of funds, the insurance companies would have the forfeited collateral *and* the $16.5 million. As the district court stated, "What [Reeder] want[s] is credit for what he left in the bank after he robbed it."

### B. Offense Enhancement

■ Reeder challenges the four-level enhancement for his role as an organizer or leader of a criminal activity that involved (1) five or more participants or (2) was otherwise extensive. *See* U.S.S.G. § 3B1.1(a). Reeder contends only that he did not lead or organize five or more persons who were "criminally responsible" for the offense. He makes no argument that the criminal activity was not "otherwise extensive," the basis for the district court's enhancement. *United States v. Rostoff,* 53 F.3d 398, 413 (1st Cir.1995) (extensiveness prong does not depend on number of participants). Reeder's assertion that Christopher was the true leader is irrelevant. The district court found that Reeder had ultimate control of Resolute, placed

Christopher in charge of the insurance companies, and directed the disposition of monies taken from the companies. A careful review of the record leaves no doubt as to the extensiveness of the criminal enterprise. ·

### CONCLUSION

For the reasons stated in this opinion, we **affirm.**

### ORDER

### May 19, 1999

Reeder's characterization of the government's argument as alleging several different schemes to defraud in the indictment is not supported by the record. Thus, this case does not present the problem addressed in *United States v. Fawley,* 137 F.3d 458 (7th Cir.1998), *United States v. Russell,* 134 F.3d 171 (3rd Cir.1998), and *United States v. Holly,* 942 F.2d 916 (5th Cir.1991).

---

1. In his brief, Reeder mischaracterizes our decision in *Christopher* by stating that this Court "agreed that the $26.7 million dollar loss could only be attributed to Christopher if he alone caused it." In *Christopher,* this Court simply stated that the loss figures used for determining the adjusted offense level are based on the assumption that "the defendant alone is responsible for the entire amount of the victim loss." 142 F.3d at 56. The Court then ruled that the

district court did not abuse its discretion in basing an upward adjustment on the entire $26.7 million loss, "[b]ecause the losses would not have occurred without Christopher's actions." *Id.* at 56–57. *We did not find that Christopher was the only one responsible for the loss, or rule that "loss" for purposes of the adjusted offense level is limited to the loss that the defendant alone caused.*