Not for Publication in West's Federal Reporter

# United States Court of Appeals
## For the First Circuit

No.  07-2095

UNITED STATES OF AMERICA,

Appellee,

v.

GEORGE SCHUSSEL,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]

Before

Lipez, Merritt,* and Howard,
Circuit Judges.

Scott A. Srebnick with whom Martin G. Weinberg and Francis DiMento were on brief for appellant.
Michael J. Sullivan with whom Jack W. Pirozzolo and Carmen M. Ortiz were on brief for appellee.

August 29, 2008

*Of the Sixth Circuit, sitting by designation.

**MERRITT**, <u>Senior Circuit Judge</u>. Defendant George Schussel was convicted after a thirteen-day jury trial of one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and two counts of tax evasion in violation of 26 U.S.C. § 7201. He was sentenced to 60 months' imprisonment on each count, to run concurrently. He now appeals his conviction, raising three issues: (1) whether documents turned over to the government from his attorney's files violate the attorney-client privilege; (2) whether the refusal of the trial court to give certain requested jury instructions violated Schussel's right to a fair trial; and (3) whether sufficient evidence supports Schussel's conviction for conspiracy. Schussel does not appeal his sentence. For the following reasons, we affirm the judgment of the district court.

## I. Facts

Defendant George Schussel is the founder of and was, at all times relevant to the charges herein, the principal shareholder of Digital Consulting, Inc. ("DCI"), a Massachusetts corporation engaged in the business of planning and conducting trade shows and conferences for businesses in the computer industry. DCI's primary source of revenue came from participants at DCI-organized events and from vendors at those events that bought booth space to display software or other products. Schussel was first the president and then the CEO of DCI and he owned 95% of the stock. Ronald Gomes, who owned the other 5% of DCI stock, succeeded Schussel as

president of DCI. Diane Reed was hired in 1985 as DCI's accountant and she later became controller. She reported primarily to Schussel.

Schussel also was the owner and President of Digital Consulting International Limited ("DCIL"), a company established in 1988 and operating in Hamilton, Bermuda, ostensibly to help DCI expand its international business. DCIL, however, was a shell company that existed in name only; it did not exist as an actual company with employees or a building. According to testimony of Diane Reed, DCI's controller, from the late 1980s through 1995, Schussel directed her to divert money generated by DCI into a Bermuda bank account held in the name of DCIL in order to avoid paying taxes on DCI income. Schussel, Schussel's wife, and Schussel's daughter, Stacy Griffin, were the authorized signatories of the Bermuda account. The types of checks deposited into the Bermuda account varied. Sometimes customer checks were deposited directly into the Bermuda account, but, over time, Reed began sending funds to the Bermuda account from various operating accounts of DCI known as "user group" accounts. DCI used these accounts to handle incoming and outgoing funds associated with particular events run by DCI. The separate accounts allowed DCI to keep client and vendor funds separated from DCI funds.

Between 1988 and 1995, Schussel diverted over $12 million of DCI's income to the Bermuda account, much of it from the "user

- 3 -

group" accounts. This was taxable income to DCI that was not reported to the IRS. After being deposited in the DCIL Bermuda account, most of the money was transferred by wire to accounts in the United States at Fidelity Investments that were maintained and controlled by Schussel. The rest of the money deposited in the Bermuda account, about 5%, was transferred to Schussel's business partner, Gomes. By depositing money in the Bermuda account and then transferring it to the Fidelity account, Schussel also avoided paying personal income tax. Reed kept track of the funds diverted to the Bermuda account by noting the amount of each deposit made and the subsequent distribution to Schussel and Gomes.

In late 1991 and early 1992, the IRS conducted an audit of DCI covering tax years 1986 to 1990. When the IRS agent in charge of the audit asked about two payments from DCI to DCIL, he was told that the payments were commissions DCI owed to DCIL for foreign events. The agent was also given fabricated documents signed by Schussel and Gomes that referenced each payment as being made for services DCIL purportedly performed for DCI.

Although tax adjustments were made for DCI for the years 1986 to 1990, the agent took no further action. In 1995, the IRS again audited DCI, this time for tax year 1993. A different agent handled the audit, and the existence of the Bermuda account was not raised by the agent or anyone at DCI.

In the mid-1990s, discussions arose about selling DCI. A concern arose that DCI would not be able to show its true value and profitability to potential buyers because income actually earned by DCI was being diverted to the DCIL Bermuda account. Two sets of numbers existed in DCI's books – one set reflected DCI's true income and the other set reflected the income reported by DCI to the Internal Revenue Service. In early 1996, it was decided that money would no longer be diverted to the Bermuda account so that the company could be sold for its "true" value. Tax year 1995, therefore, was the last year that the corporate return omitted income DCI had diverted to Bermuda. The Bermuda account was not closed until 1997, but Schussel reported on his 1996 personal return that he did not control any foreign bank accounts.

In early 1997, Gomes and Schussel met with attorney Kenneth Glusman regarding the sale of DCI. At an evidentiary hearing to consider admission into evidence of various attorney-client communications, attorney Glusman testified that at his first meeting with Schussel and Gomes, the men told him about the shell company DCIL and the Bermuda account to which money had been diverted, including the fact that DCI had not been reporting all of its taxable income to the IRS for a number of years. Glusman, who did not have experience with criminal tax matters, testified that his main concern at that point was not Schussel's and Gomes' liability for not paying taxes, but the fact that anyone who

- 5 -

purchased DCI would be buying a company with a potentially large liability for unpaid taxes.

Also occurring in 1997 was the decision among Schussel, Gomes, Diane Reed (the controller of DCI), Schussel's daughter, Stacey Griffin, and her husband, Michael, both DCI employees, to destroy certain DCI records. Specifically, Michael Griffin recommended a plan to delete and alter DCI's computerized accounting records so that if an audit were to occur, revenue information in the computer would match the revenue information in the 1995 corporate tax return. The discussion stemmed from concern that potential buyers might discover the discrepancies in DCI's records due to the deposits of money into the Bermuda account. Records in DCI's computer database showed that DCI's income receipts did not match DCI's corporate bank account due to the monies that had been transferred to the Bermuda account. Gomes testified that the record destruction plan was referred to as "Project Phoenix" and the project's goal was to alter DCI's electronic database to ensure that the information in the database matched income reported in DCI's corporate tax returns.[1] In July 1997, at Gomes' direction, Reed prepared a list of documents to "Keep or Lose" in case of an IRS audit or a sale. An "All Staff Memo" dated July 29, 1997, from the "Archiving Committee" directed the destruction of records as

---

[1]Information and records relating to the Bermuda account of DCIL were not maintained in the DCI database and were not destroyed.

part of a "routine" clean up.  Reed questioned Gomes about this memo and he told her he wanted to make sure all the documents were "purged."

DCI learned in September 1997 that it would undergo an IRS audit of its 1995 tax return.  On October 27, 1997, Reed, Schussel and Paul Law, DCI's accountant, met with Kelly McGovern, an IRS agent.[2]  Prior to the October meeting, Reed had collected all of the documentation requested by McGovern, other than documents pertaining to DCIL and the Bermuda account.  The over $4 million diverted to the Bermuda account in 1995 was therefore not disclosed to the IRS agent.  Concern arose at DCI, however, when, during the investigation, McGovern found a refund check issued to a vendor written from a "user group" account, the separate accounts DCI used to handle the funds for certain specific events.  The refund check had come from the general DCI account because that particular "user group" account had been closed.  This led McGovern to inquire about the separate accounts of "user groups."  DCI became concerned that if a thorough examination of each "user group" account was conducted, it would be discovered that money from these accounts had been transferred to the Bermuda account.

McGovern's discovery of the "user group" accounts led to another meeting in November 1998 with Schussel, Schussel's wife,

---

[2]IRS Agent McGovern is referred to in various places in the record and briefs as Kelly Jordan, her married name.

Gomes and his wife, Stacey and Michael Griffin, Reed and Glusman, the attorney. Reed testified that Glusman was told at that meeting that monies from the user group accounts had been transferred to the Bermuda account. Glusman then left the meeting and further discussion took place regarding whether information in the DCI database could be destroyed or at least made confusing and difficult for the IRS to understand.

Upon learning about the audit, attorney Glusman recommended to Schussel that he hire an attorney with experience in criminal tax matters. On Glusman's recommendation, Schussel hired Edward DeFranceschi to represent both Schussel and DCI in the 1997 audit. Gomes and Schussel first met with DeFranceschi in November 1997 and told him that income had been diverted from DCI to the Bermuda account and had not been reported to the IRS. Glusman was also present at the meeting. Reed met with DeFranceschi and showed him the user group documentation and checks that had been sent to the Bermuda account. She also showed him documentation that showed money being sent from DCI user groups to the Bermuda account and back to Schussel's Fidelity account in the United States. DeFranceschi took over communicating with IRS agent McGovern and recommended that no one from DCI communicate directly with the IRS. DeFranceschi relied mainly on Schussel for information disclosed to the IRS. Reed was instructed by Schussel to provide information to DeFranceschi and Schussel as needed by DeFranceschi.

In February 1998, McGovern discovered more "user group" checks and inquired about the relationship between DCI, DCIL and Schussel. DeFranceschi provided her with a copy of a contract between DCI and DCIL dated September 1993, given to him by Schussel. The contract was signed by "J. Cardullo" on behalf of DCIL and provided that DCI would compensate DCIL for "services rendered." DeFranceschi represented to McGovern that the contract had been in effect in various forms since 1988. Gomes and Reed testified that they did not see the contract at the time it was executed in 1993. Gomes said he first saw the contract in 1997 during the IRS audit. Reed, who was responsible for maintaining all of DCI's contracts in her position as controller, testified that she did not see the contract until 2003, when it was shown to her by the government. John Cardullo, who was hired by DCI in 1988 to be Director of International Operations, testified that he never signed the contract, nor did he authorize anyone else to sign on his behalf. He also testified that he had never conducted any business with DCIL or any other company in Bermuda while at DCI. In addition, Cardullo left DCI before September 1993, the date he purportedly signed the contract.

After receiving the contract between DCIL and DCI, IRS agent McGovern requested certain documents from DeFranceschi concerning DCIL, Schussel's relationship with DCIL and the relationship between DCI and DCIL. On March 4, 1998, Schussel faxed responses

to some of the questions to DeFranceschi and provided a description of what had occurred concerning DCIL in the earlier audit in 1991 and 1995.  Schussel asserted that he "had provided [the IRS] with the complete file which I had in my possession at that time" and indicated that on both occasions the IRS had not  found a problem with the DCI-DCIL connection.  Schussel also supplied two "exhibits" to DeFranceschi that purported to document international events for which DCI compensated DCIL.

DeFranceschi, using the information supplied to him by Schussel, drafted a response to the IRS document request.  He sent the draft response to Schussel, who made notations on the draft that indicate that he discussed the response with DeFranceschi.  On March 12, 1998, DeFranceschi sent the letter to IRS agent McGovern.  Based on the representations in this letter, IRS agent McGovern concluded that DCI and DCIL were not related entities, that Schussel had no control over DCIL, and that the business conducted by DCIL was outside the scope of her audit of DCI.  Glusman and Reed testified that McGovern never asked to see the actual records of DCIL.  Pursuant to a letter dated May 6, 1998, the audit was concluded with the IRS making certain adjustments to DCI's corporate return for 1995.  None of these adjustments reflected the DCI income that Schussel had diverted to the Bermuda account.

After the 1997 audit concluded, Gomes and Schussel discussed amending their personal tax returns for 1995 to reflect income that

had not been disclosed at the time. At Schussel's request, controller Reed provided to attorney DeFranceschi documentation regarding the Bermuda account, as well as documentation concerning Schussel's Fidelity account, so that DeFranceschi could prepare an amended return for Schussel. Although an amended return was prepared by DeFranceschi, it was never filed based on advice from DeFranceschi.

In October 2001, Darlene Flint, who had worked as Gomes' secretary for 18 years, walked into the IRS office in Stoneham, Massachusetts, with a box of DCI records that included the Bermuda account records. This disclosure triggered a criminal investigation of DCI and its employees. Reed and Gomes cooperated in the investigation and provided information implicating Schussel in both the diversion of taxable income and obstruction of IRS audits. In addition to the DCI employees, attorney DeFranceschi's conduct was also questioned by the federal prosecutor. Upon learning that he was a subject and potential target of the investigation, DeFranceschi hired his own attorney, Elliot Lobel, who contacted the federal prosecutor and offered to provide evidence that DeFranceschi did not knowingly provide false information to the IRS or obstruct the 1998 audit. Lobel determined that the Massachusetts Rules of Professional Conduct allowed DeFranceschi to reveal attorney-client privileged information to the extent necessary to defend himself from criminal

charges. Lobel allowed DeFranceschi to make a statement pursuant to a proffer letter with the government. In the proffer, DeFranceschi stated that Schussel had provided him with all the information and material provided to the IRS. The prosecutor told Lobel that the government would require documentary evidence to prove that DeFranceschi had not knowingly participated in Schussel's illegal scheme. Lobel produced a limited number of documents deemed necessary to prove DeFranceschi's innocence, along with an affidavit by DeFranceschi. DeFranceschi did not turn over his entire Schussel file to the government. The government decided not to indict DeFranceschi.

On February 26, 2004, a federal grand jury returned a three-count indictment against Schussel, charging him with conspiring with unnamed others, known and unknown, to defraud the United States in the collection of income taxes in violation of 18 U.S.C. § 371 (Count I), and two counts of tax evasion in violation of 26 U.S.C. § 7201. Specifically, the tax evasion counts allege that Schussel made false statements to a revenue agent of the Internal Revenue Service and filed a false and fraudulent corporate income tax return (Count II) and individual tax return (Count III). The indictment charged that the offense conduct in the conspiracy in Count I began in or about January 1988 and extended through May 1998. The offense conduct in Counts II and III occurred in March

1998 during an audit of Schussel's individual and corporate tax returns for 1995.

The indictment charged that Schussel and others "intentionally and willfully caused the filing of false and fraudulent Corporate U.S. Income Tax Returns to be filed with the IRS for the purpose of evading and defeating income tax due and owing for several years." Indictment at ¶ 32. The indictment also specifically stated that Schussel and others had failed to disclose DCI income which had been diverted to DCIL's bank account in Bermuda in the amount of $8.5 million from 1993 through 1995. The indictment also charged that Schussel and others "for purposes of preventing discovery of DCI's unreported income, endeavored to impede and obstruct an audit conducted by the IRS of DCI's 1995 Corporate U.S. Income Tax Return." Indictment at ¶ 34. The overt acts charged in furtherance of the conspiracy included Schussel's hiring of a tax attorney in 1997 to represent him during the audit and his use of the attorney "to impede and obstruct the audit." Indictment at ¶ 40 (ee). At issue on appeal are the following overt acts charged in the indictment:

> gg. On or about March 11, 1998, Schussel caused the tax attorney who was acting on his behalf, to send a letter to the revenue agent, which letter falsely stated, among other things, that Schussel was not an officer of DCIL and falsely represented that payments made by DCI to DCIL were pursuant to the contract purportedly executed between DCI and DCIL in September 1993.

> hh. On or about May 6, 1998, Schussel signed IRS Form CG-4549, acknowledging and agreeing to income tax

- 13 -

examination changes that the revenue agent had made to DCI's 1995 Corporate U.S. Income tax Return which showed that $18,859.00 was additional income tax due for DCI's 1995 calendar year. As Schussel well knew, this amount was, in fact, substantially less than the true amount due to the IRS because Schussel had concealed DCI's true income from 1995 from the revenue agent during the course of the audit.

Indictment at ¶ 40 (gg, hh).

Count II of the indictment charged that on March 11, 1998, Schussel did "willfully attempt to evade and defeat" part of the federal income tax owed by DCI by "making and causing to be made" false statements to an IRS agent in order to mislead and impede an audit examination of DCI's 1995 corporate income tax return, and by "filing and causing to be filed" with the IRS a false and fraudulent income tax return underreporting DCI's taxable income for 1995. Indictment at ¶ 91. Count III charged that on or about March 11, 1998, Schussel willfully attempted to evade and defeat part of the personal income tax owed by him by "making and causing to be made false statements" to the revenue agent in order to mislead and impede the audit of DCI's 1995 corporate income tax return, and by "filing and causing to be filed" with the IRS a false and fraudulent individual income tax return by underreporting his taxable income for 1995. Indictment at ¶ 93.

Before trial, Schussel moved to suppress documents on the basis of various privileges, including the attorney-client privilege, the corporate attorney-client privilege and the joint defense/common interest privilege. An evidentiary hearing was

- 14 -

held in May 2005 before Magistrate Judge Alexander. Reed, Gomes, Schussel's attorneys Glusman and DeFranceschi and others testified. The magistrate judge found that of the thirteen documents at issue three were privileged and the government was prevented from using them at trial. The other ten were either not privileged or the privilege was vitiated under an exception, such as the crime-fraud exception or third-party disclosure rule. Of the six documents at issue in this appeal, the Magistrate Judge held that two (Exs. 65 and 73) were not privileged under the third-party disclosure rule and one (Ex. 67) was not privileged because it was not a confidential communication. Three documents (Exs. 66, 68 and 71) lost their privilege under the crime-fraud exception. See Findings and Recommendation on Motion to Suppress Government's Use and Acquisition of Privileged Materials and for Other Appropriate Relief, August 25, 2005. Over Schussel's objection, the district court adopted the Magistrate Judge's Findings and Recommendation.

## II.  Analysis

Schussel raises three main issues on appeal:  (1) the attorney-client relationship was violated when documents sent between Schussel and his lawyer were introduced into evidence at trial; (2) the district court erred in refusing to give certain jury instructions requested by Schussel pertaining to the tax evasion counts; and (3) the evidence was insufficient to support the conspiracy conviction.

- 15 -

## A. **Attorney-Client Privilege**

The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients . . . ." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege is not absolute, however, and does not extend to all communications between an attorney and client. The privilege protects "only those communications that are confidential and are made for the purpose of seeking or receiving legal advice." In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003). The First Circuit has adopted the following definition of the attorney client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

United States v. Mass. Inst. of Tech.. 129 F.3d 681, 684 (1st Cir. 1997) (quoting 8 J. Wigmore, *Evidence* § 2292, at 554 (McNaughton rev. 1961)). The burden of proving an applicable privilege lies with the party claiming the privilege. The party must demonstrate by a preponderance of the evidence not only that the privilege applies, but that it has not been waived or that exceptions do not apply. FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000).

Following his indictment, Schussel filed a motion to suppress thirteen documents supplied by his tax attorney, Edward

- 16 -

DeFranceschi, to the government, claiming they were privileged and confidential pursuant to attorney-client privilege.[3]  Of the thirteen documents, the district court found three to be protected by the attorney-client privilege.  Of the remaining ten documents at issue, the district court found most of them not to be protected under the attorney-client privilege either because they were not confidential due to their content or due to the fact that they were intended to be disclosed to a third-party.  Three documents that were found to be confidential had the attorney-client privilege vitiated due to the "crime-fraud exception," which exempts privileged documents from protection if the client seeks advice from a lawyer that will serve him in the commission of a crime or fraud.  Only six of the documents are at issue on appeal; all six documents came from the files of Ed DeFranceschi, Schussel's attorney at the time of an IRS audit in 1998.

The six documents at issue on appeal are:

**Exhibit 65**:  A fax dated 2/16/98 from Schussel to DeFranceschi telling DeFranceschi that the information in a 2/13/98 letter sent to the IRS by DeFranceschi is incorrect and should be corrected to say:  "I am advised that the transactions for 1988 through 1991 were reviewed in 1993 as part of the IRS audit for the years 1987-1991."  As the district court ruled, this document was properly

---

[3]Schussel also moved to suppress documents provided to the government by Gomes and Flint.  The court's rulings on those documents are not at issue in this appeal.

admitted under the third-party disclosure rule because Schussel intended, and indeed directed, that DeFranceschi disclose the information to a third-party – the IRS.

**Exhibit 66**: A fax dated 3/4/98 from Schussel to DeFranceschi with draft responses to questions 1-3 of a document request from the IRS. This document was admitted under the "crime-fraud exception" to the attorney-client privilege.

**Exhibit 67**: A fax dated 3/6/98 from Schussel to DeFranceschi requesting that DeFranceschi ask the IRS agent when Schussel can "take down" the data room at Schussel's offices that was set up for the IRS examination. The district court found this document not to be a confidential communication and therefore not privileged.

**Exhibit 68**: Draft of letter dated 3/11/98 to be sent to IRS agent concerning Document request #4. This document was admitted under the "crime-fraud exception" to the attorney-client privilege.

**Exhibit 71**: Fax from Schussel to DeFranceschi dated 3/12/98 reminding DeFranceschi that the auditor who performed the 1993 audit had some questions about a cash transaction involving one of DCI's user groups and the questions were answered to the agent's satisfaction at that time. This document was admitted under the "crime-fraud exception" to the attorney-client privilege.

**Exhibit 73**: Fax from Schussel to DeFranceschi dated 4/24/98 alerting DeFranceschi to a package of tax forms, schedules and other material DeFranceschi will be receiving from Schussel under

separate cover. This document was admitted under the third-party disclosure rule because Schussel intended that DeFranceschi disclose the information to a third-party – the IRS.

## 1. **Waiver**

The government first argues that Schussel waived the privilege as to all six documents because in the trial court Schussel made selective use of the documents as part of an advice-of-counsel defense – sometimes wanting to use them in his defense and other times wanting to withhold them on the ground of attorney-client privilege. The government argues that once Schussel put any communications with DeFranceschi in evidence pursuant to an advice-of-counsel defense, he waived the attorney-client privilege as to all communications with DeFranceschi. However, the district court did not admit the documents on the basis of waiver and, because a determination of waiver often requires a detailed factual analysis, we decline to make such a finding in this appeal.

## 2. **Contents Not Privileged**

Exhibit 67 is a fax dated March 6, 1998, from Schussel to DeFranceschi requesting that DeFranceschi ask the IRS agent when Schussel can dismantle a data and records room at Schussel's offices that was set up for the IRS examination. Because the communication did not seek or give legal advice, the district court found this document not to be a confidential communication and therefore not privileged. This finding was not clearly erroneous.

- 19 -

### 3.  **The Crime-Fraud Exception to the Attorney-Client Privilege**

Under the "crime-fraud exception," the attorney-client privilege does not apply when a client seeks advice from a lawyer that will serve him in the commission of a crime or fraud. Clark v. United States, 289 U.S. 1, 15 (1933); accord In re Grand Jury Proceedings, 417 F.3d 18, 22 (1st Cir. 2005); United States v. Reeder, 170 F.3d 93, 106 (1st Cir. 1999).  The exception applies where there is a "reasonable basis to believe that the lawyer's services were used by the client to foster a crime or fraud." In re Grand Jury Proceedings, 417 F.3d at 23.  The exception applies based on the client's intent, not the lawyer's. In re Grand Jury Proceedings (Violette), 183 F.3d 71, 79 (1st Cir. 1999).  The exception applies, therefore, regardless of whether the attorney was an innocent or willing accomplice.  To "successfully invoke the crime-fraud exception, the government must make a prima facie showing that the attorney's assistance was sought in furtherance of a crime or fraud." Reeder, 170 F.3d at 106.  The government must show:  (1) that the client was engaged in (or was planning) criminal or fraudulent activity when the attorney-client communications took place; *and* (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity. In re Grand Jury Proceeding, 183 F.3d at 75.   The district court found that the exception applied to Exhibits 66, 68 and 71, all three of which were faxes or drafts sent to DeFranceschi by Schussel

in March 1998 when DeFranceschi was trying to gather information from Schussel and DCI to respond to IRS inquiries or document requests. The district court correctly applied the exception because in each of the three documents Schussel was providing incorrect information to DeFranceschi to be used in responses to document requests and other exchanges with the IRS in an effort to deceive the IRS about the true nature of Schussel's relationship with DCIL.

Schussel's attempts to characterize these communications as simply soliciting legal advice from DeFranceschi belies their content and Schussel's intent in relaying the information to DeFranceschi. The three documents were clearly sent to DeFranceschi by Schussel so that Schussel and DCI could continue to evade the taxes they owed. In Exhibit 66, the March 4, 1998, fax from Schussel to DeFranceschi, Schussel provided false information to DeFranceschi about the business relationship between DCI and DCIL by stating that DCIL had performed services for DCI and received compensation. In Exhibit 68, the March 12, 1998, draft letter to the IRS from DeFranceschi on behalf of Schussel and DCI, Schussel provided false information about the contract between DCI and DCIL. As to Exhibit 71, the March 12, 1998, fax to DeFranceschi from Schussel, Schussel reported to DeFranceschi that in the earlier 1995 audit, the IRS had questioned a cash payment to a user group account. Schussel intended for DeFranceschi to use this information

- 21 -

to mislead the IRS into believing that the user group accounts had already been examined by the IRS during an earlier audit.

Schussel argues that the exception cannot apply because he had not yet been found guilty of any wrongdoing. The crime-fraud exception may apply, however, even if the client is ultimately found not to be guilty. By necessity, the assessment of documents during a legal proceeding is generally preliminary and does not reflect a finding that a client acted wrongfully. The required level of proof to pierce the privilege under the crime-fraud exception is limited to the issue of whether reasonable cause adequate to pierce the privilege exists. In re Grand Jury Proceedings, 417 F.3d at 22. Both the district court and the magistrate judge held hearings where findings were made that a sufficient factual predicate existed to pierce the privilege as to these documents. The district court's admission of Exhibits 66, 68 and 71 under the crime-fraud exception was not clearly erroneous.

Schussel also argues that even if the crime-fraud exception applied, the documents should be suppressed and his conviction reversed as a sanction against the government for violating his due process rights when it "induced" DeFranceschi to turn over certain documents without notifying Schussel first. This argument is also without merit. Attorneys may disclose confidential client information to the extent the attorney reasonably believes such disclosure is necessary to defend himself against a charge of

criminal wrongdoing.  See Mass. Rules of Prof'l Conduct 1.6(b)(2) (a lawyer may reveal confidential information "to the extent the lawyer reasonably believes necessary  . . .  to establish a defense to a criminal charge . . . against the lawyer based on conduct in which the client was involved").  Moreover, an attorney need not wait to be indicted before making such disclosures.  Id. cmt. 18 ("Paragraph (b)(2) does not require the lawyer to await commencement of an action or proceeding that charges such complicity [with the client], so that the defense may be established by responding directly to a third party who has made such an assertion."); United States v. Weger, 709 F.2d 1151, 1156-57 (7th Cir. 1983) (permitting a law firm to disclose privileged information before formal charges filed to avoid stigma of indictment).

Under the Massachusetts Rules of Professional Conduct, therefore, and general legal principles aimed at preserving client confidentiality to the fullest extent possible, DeFranceschi was permitted to make a limited disclosure of information to the government to defend himself from indictment.  Once the United States notified DeFranceschi's attorney that DeFranceschi was a potential target of the investigation into DCI and Schussel, DeFranceschi became entitled immediately to disclose information showing that he should not be charged.

Citing to United States v. Zolin, 491 U.S. 554 (1989), Schussel claims he had a due process right to be notified by either the

- 23 -

government or DeFranceschi before DeFranceschi made the disclosure to the government.  Schussel's reliance on <u>Zolin</u> is misplaced. <u>Zolin</u> held only that a court may receive contested documents for <u>in camera</u> inspection to assess whether the crime-fraud exception applies.  It makes no requirement that an attorney give advance notice to the client about his intention to disclose client documents to a third party in order to defend himself from criminal charges.  While we are mindful of Schussel's argument that notice is required due to the potential manipulation of an attorney by an overzealous or unethical prosecutor accusing the attorney of criminal wrongdoing in order to get access to documents that might be helpful in building a case against the client, Schussel has cited no evidence that such was the case here.

Finally, to the extent there was any error in admitting the three documents under the crime-fraud exception, the error was harmless.  Other evidence at trial, including non-privileged documents and testimony by witnesses, including employees of DCI, was sufficient to show Schussel's guilt.  Such evidence included the false contract given by Schussel to DeFranceschi, knowing it would be turned over to the IRS.  Evidence was also introduced showing that after each of the audits, Schussel had signed off on the adjustments to his and DCI's taxes recommended by the IRS knowing that the income diverted to the Bermuda account was not included in the adjustments.  This evidence and the testimony by numerous

witnesses was sufficient for the jury to conclude that Schussel had the necessary intent to mislead and deceive the IRS to support the conspiracy and tax evasion counts.

## 4.  **Third-Party Disclosure**

The third-party disclosure exception supports the principle that the attorney-client privilege does not attach to communications between attorney and client when they have been disclosed to a third party or were created with the intention of being disclosed to a third party.  "When information is transmitted to an attorney with the intent that the information will be transmitted to a third-party . . ., such information is not confidential."  United States v. Lawless, 709 F.2d 485, 487 (7th Cir. 1983) (finding waiver of attorney-client privilege where information used to prepare tax return would be disclosed on the tax return itself).

Both Exhibits 65 and 73 contained information that Schussel sent to DeFranceschi with the intent that the information be turned over to the IRS.  Therefore, the documents are not privileged and no attorney-client confidentiality attaches to them.  Exhibit 65 is a fax sent by Schussel to DeFranceschi in which Schussel provides information for DeFranceschi to give to IRS agent McGovern.  Exhibit 73 consists of drafts of amended tax returns for Schussel and Gomes. As the information provided in both these documents was intended to be disclosed to the IRS, it is not confidential.  Schussel argues that Exhibit 73 is a working draft between attorney and client that

is therefore privileged.  If a client transmits information "so that it might be used on a tax return, such transmission destroys any expectation of confidentiality that might have otherwise existed."

Lawless, 709 F.2d at 487.  The court below correctly ruled that the documents are not privileged.

## B.  Jury Instructions

Schussel claims error as to several of the jury instructions. Schussel filed requests for specific jury instructions concerning willfulness and the attorney-client relationship that were rejected by the district court as incorrect statements of the law.  Another requested instruction sought to "supplement" the conspiracy instruction to specifically inform the jury that DeFranceschi, Schussel's tax attorney, was not part of the conspiracy.

## 1.  Willfulness

Schussel claims it was error for the district court to reject a request he made to instruct the jury on additions to the standard willfulness instructions applicable to tax evasion charges under Cheek v. United States, 498 U.S. 192 (1991).[4]  The district court's

---

[4]Schussel requested several instructions on willfulness that were rejected by the district court.  Although we do not recite each of Schussel's requested willfulness instructions herein, we reproduce several examples to demonstrate the nature of the requested instructions:

Instruction No. 3
Willfulness

Defendant Schussel acted wilfully if the law imposed a duty on him, he knew of that duty, and he voluntarily and

instruction explicitly focused the jury on the requirement that Schussel have "the specific intent to disobey or disregard the law," which satisfies the <u>Cheek</u> willfulness requirement.    Schussel's requested instruction changed the standard tax evasion instruction to instruct the jury that it could not find guilt unless it concluded that Schussel knew he had a legal duty to reject his attorney's advice, which was based on the misinformation that Schussel had supplied to him.    Specifically, the requested

---

intentionally violated that duty.   Thus, if defendant Schussel acted in good faith, he cannot be guilty of filing a false and fraudulent tax return, as charged in Counts Two and three.   This is a subjective standard; the question is what defendant Schussel actually believed, not what a reasonable person would have believed. negligence, even gross negligence, is not enough to meet the wilfulness [sic] requirement. . . .

Instruction 3(A)

Thus, you cannot convict defendant Schussel of the offenses charged in Counts Two or Three unless the government proves beyond a reasonable doubt that he knew that he had the duty to instruct his attorney Edward DeFranceschi to make changes in the letter to the IRS prepared by DeFranceschi dated march 11, 1998.

. . .

Instruction 3(D)

. . .

You may not convict defendant Schussel of the offenses charged in Counts Two or Three based upon the signing of the May 6, 1998, letter unless you find beyond a reasonable doubt that he knew he had a duty to reject his attorney's advice that he sing the may 6, 1998, adjustment letter.

instruction would have required Schussel to know he had a legal duty to tell DeFranceschi to change the March 11, 1998, letter sent to the IRS and to reject DeFranceschi's advice to sign the May 6, 1998, tax adjustment letter because they were based on false or misleading information. The requested instruction indicated, erroneously, that once a client hires an attorney and makes certain disclosures to that lawyer, the client cannot have acted "willfully" if the lawyer passes on false information to the IRS. This is an improper reading of the meaning of "willfulness" under the tax evasion statutes and the district court properly rejected this proposed instruction.

In addition, Schussel's requested "willfulness" instructions focus too much on the lawyer's duty to the client under ethical and professional responsibility rules instead of on the taxpayer's conduct. The tax evasion statute, and its standard "willfulness" instruction, focuses solely on the taxpayer's duty to pay the tax imposed and to not mislead the IRS about that amount. They do not look to the attorney's conduct in representing the client.

Requested instructions are appropriate only if they correctly state the law. United States v. Buttrick, 432 F.3d 373, 376 (1st Cir. 2005). Schussel's requested instruction concerning the attorney-client relationship as it applies to the willfulness requirement to prove a tax evasion charge was simply incorrect. The tax evasion statute at issue, 26 U.S.C. § 7201, prohibits willfully attempting in any manner to evade or defeat any tax imposed or

payment thereof.  The relevant legal duty requires that the taxpayer pay the required income tax and not mislead the IRS.  Schussel's requested instruction sought to add on a multitude of concepts from the advice-of-counsel defense and attorney ethical rules.

## 2. **Literal Truth Instruction**

Schussel also claims error concerning the rejection by the district court of Schussel's proposed instruction telling the jury it could not consider as "false" any statement Schussel made responding to the IRS if that statement were "literally" true – even if the statement was found by the jury to be incomplete or misleading.  The court below found that this instruction only applied to perjury cases and not to actions taken with the "intent to mislead or conceal" as stated in the tax evasion statutes.

Schussel's requested instruction[5] informed the jury that DeFranceschi had told the IRS the "literal truth" in answering its inquiries, such as informing the IRS that Schussel "is" not an officer or employee of DCIL and that payments made to DCIL by DCI were pursuant to a "contract," even though DeFranceschi knew that DCIL was a shell company to which Schussel had diverted funds. Specifically, Schussel argues that DeFranceschi knew that the answers in the March 11, 1998, letter to the IRS were misleading, but they were in keeping with the general practice whereby attorneys recommend that their clients narrowly answer questions without volunteering information.

Schussel's request that the jury be told specifically that they must consider whether the answers given to the IRS in the March 11, 1998, letter were "literally true" does not reflect a correct

---

[5]The requested instruction reads in relevant part:

Instruction No. 10

False Statments

Counts Two and Three charge defendant Schussel with wilfully attempting to evade and defeat a part of the income tax due and owing by DCI and by himself personally by making false statements to an IRS revenue officer or by causing false statements to be made to an IRS revenue officer. In determining whether defendant Schussel is guilty of the offense charged in Counts Two and Three, you may not consider as false statements any statements which were made in response to questions asked by Revenue Agent Kelly McGovern Jordan and which were literally true, even if those statements are determined by you to have been incomplete or even misleading.

statement of the law. A "literal truth" instruction does not take into account the language of 26 U.S.C. § 7201, the tax evasion statute, which prohibits "any conduct, the *likely effect of which would be to mislead or conceal*." (Emphasis added.) As the statute prohibits conduct that misleads or conceals, the "literal truth" may still violate the tax statute. The plain language of the statute covers a broader range of conduct than Schussel's proposed instruction would reflect. The cases that Schussel relies on for the correctness of his "literal truth" instruction all concern perjury, false statements and obstruction of justice charges, not the broader conduct prohibited by the tax evasion statute.

In addition, the instruction the district court gave to the jury about the March 11 letter asked the jury to consider whether Schussel had made or caused to be made "false statements to the revenue agent." There is nothing in that instruction that prohibits the jury from considering the "literal truth" of Schussel's answers and Schussel did in fact make that argument to the jury.

In sum, what Schussel was trying to accomplish by his requested instructions was to inform the jury, incorrectly, that when a taxpayer hires professionals to perform legal services for him, the taxpayer may rely on those services to such an extent that the taxpayer does not act "willfully" under the tax evasion statute if he retains counsel for an audit. The district court was correct to

reject the changes to the tax evasion instructions requested by Schussel.

### 3. **Supplemental Instruction on DeFranceschi's Role**

The indictment in this case, which came down on February 26, 2004, alleged that the conspiracy involved "others known and unknown to the Grand Jury." This language permitted the jury to convict Schussel based on a conspiracy with persons not named in the indictment and, in fact, the coconspirators are all unnamed. When describing the overt acts in furtherance of the conspiracy, the indictment refers to DCI controller Diane Reed as "D.R." and minority shareholder Ronald Gomes as R.G. Stacey and Michael Griffin, Schussel's daughter and son-in-law, are also unindicted coconspirators. Attorney Edward DeFranceschi is not mentioned in the conspiracy count in any way.

The statute of limitations for the conspiracy is six years, so the government was required to prove an ongoing conspiracy among Schussel and his coconspirators as of February 26, 1998, during the time frame when DeFranceschi was representing Schussel in connection with the 1997-98 audit concerning the 1995 tax year. Schussel claims on appeal that the government wanted the jury to believe that DeFranceschi was part of the conspiracy because it was easier for the government to prove the existence of a conspiracy as of February 26, 1998, between Schussel and DeFranceschi than trying to prove that Reed, Gomes and others were still part of the conspiracy as of

that date.  Schussel's interaction with DeFranceschi during this time period was very clear and Schussel maintains that the others in the conspiracy, such as Gomes and Reed, had withdrawn from the conspiracy, as argued by Schussel in his challenge to the sufficiency of the evidence for the conspiracy count, which is addressed infra.

In an effort to counter what Schussel calls a "change in course" by the government to have the jury believe that DeFranceschi was part of the conspiracy, Schussel requested a specific instruction that "the government does not allege that DeFranceschi was a coconspirator."  The district court refused to give the jury the supplemental language and gave a standard instruction concerning the conspiracy:

> You are not being asked whether any other person is guilty or not guilty of those offenses or should have been charged with a crime.  Your verdict should be based solely upon the evidence or lack of evidence as to Dr. Schussel in accordance with my instructions.

The instruction is not confusing, as argued by Schussel.  It told the jury not to take into consideration the question of whether some other person should or should not have been charged.  The instruction does not suggest, as Schussel argues, that DeFranceschi should have been charged as a coconspirator.  Moreover, the United States did not imply or suggest during the trial that DeFranceschi was or should have been charged as a coconspirator.  Indeed, the United States told the jury that the evidence did not support the

inference that Schussel had acted in good faith with DeFranceschi and instead suggested that Schussel used him as a "scapegoat." The government stated that the evidence showed that DeFranceschi believed that the contract between DCI and DCIL was a true and valid contract when he turned it over to the IRS. Therefore, contrary to Schussel's allegations that the government tried to portray DeFranceschi as a coconspirator, the United States made clear to the jury that Schussel "use[d] the lawyer as a conduit to give false information to the IRS."

## C. **Sufficiency of the Evidence**

The evidence showed that Schussel and unindicted coconspirators Reed, Gomes, and Stacey and Michael Griffin, engaged in a conspiracy to evade taxes and that the conspiracy lasted until at least May 1998. Schussel claims that, if a conspiracy existed at all, his coconspirators withdrew prior to February 26, 1998, the date on which the conspiracy must have existed to be within the six-year statute of limitations. The documents submitted to DeFranceschi and the IRS after February 26, 1998, demonstrate that the conspiracy was still active until at least the signing of the adjustment letter with the IRS by Schussel in May 1998. Numerous exhibits and documents show the ongoing nature of the conspiracy after February 26, 1998.

Withdrawal from a conspiracy as a defense requires affirmative evidence of an effort to defeat, disavow or confess the conspiracy.

United States v. Potter, 463 F.3d 9, 20 (1st Cir. 2006). The defense requires either a full confession to authorities or a communication to coconspirators that the individual has abandoned the enterprise and its goals. United States v. Pizarro-Berrios, 448 F.3d 1, 10 (1st Cir. 2006). Mere cessation of activity in furtherance of a conspiracy does not constitute withdrawal. Id. Contrary to Schussel's argument, none of the unindicted coconspirators met the demanding standard for withdrawal.

Although Diane Reed, DCI's controller, did not interact directly with IRS agent McGovern after Schussel hired attorney DeFranceschi in late 1997, she continued to play an active role in the conspiracy as a conduit of information between Schussel and DeFranceschi. Reed provided DeFranceschi with information after February 26, 1998, that was subsequently provided to the IRS, such as information included in the March 11, 1998, letter from DeFranceschi to agent McGovern.

Schussel's contention that Gomes withdrew from the conspiracy also fails. Schussel contends that Gomes' "state of mind" after January 1996, when DCI ceased sending money to the Bermuda account, demonstrates that he had withdrawn from the conspiracy. However, Gomes' "state of mind" is not evidence of an affirmative withdrawal from the conspiracy. Schussel points to no affirmative act by Gomes indicating that he left or intended to leave the conspiracy.

He continued to be a minority shareholder and business partner of Schussel in DCI.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.