T.C. Memo. 2013-32

UNITED STATES TAX COURT

GEORGE SCHUSSEL, TRANSFEREE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4050-11.                          Filed January 31, 2013.

Francis J. DiMento, for petitioner.

Carina J. Campobasso, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  Respondent determined that petitioner is liable as a

transferee to the extent of $2,044,106, $2,522,944, and $4,356,279 for 1993, 1994,

and 1995, respectively, for the Federal income tax liabilities and fraud penalties

assessed against Driftwood Massachusetts Business Trust, formerly known as

[*2] Digital Consulting, Inc. (DCI or corporation). The issues for decision are whether he is so liable and, if so, to what extent; whether certain funds transferred to him were payment for his intellectual property and not income of DCI; and whether he is entitled to credits for retransfers to DCI. A statute of limitations defense previously asserted by petitioner has been deemed abandoned because of his failure to address it in his brief. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Florida when he filed the petition.

Our findings of fact include only a summary of those material to the transferee liability issues in this case. Additional details appear in the opinion of the Court of Appeals that affirmed petitioner's conviction for tax evasion and conspiracy to defraud the United States. See United States v. Schussel, 291 Fed. Appx. 336 (1st Cir. 2008). Those details, however, need not be repeated here. Our findings simply explain respondent's determination and DCI's activities as background for petitioner's attempt to recharacterize the transfers from DCI to the

**[*3]** DCIL Bermuda account as payments for petitioner's intellectual property. The facts found are also those relevant to petitioner's claims that he retransferred funds to DCI and is entitled to credit for those retransfers against his liability.

Petitioner incorporated DCI in 1983 as a Massachusetts for profit corporation. Ronald Gomes joined DCI in 1983. During 1993, 1994, and 1995 petitioner owned 95% of DCI and Gomes owned 5%. Diane Reed was hired as DCI's accountant in 1985 and later was promoted to be DCI's controller. DCI conducted trade shows and educational seminars for software companies and other corporations. DCI earned revenue from three sources: (1) "attendee sales", which were fees paid by individuals to attend conferences and events put on by DCI; (2) "exhibit sales" (also called "vendor sales"), which were fees paid by companies to exhibit their products and services at DCI-sponsored conferences; and (3) "user group" accounts, which were accounts set up for deposits of fees made by attendees of events and conferences run by DCI for other companies, such as Sybase, Microsoft, or IBM (sponsoring companies).

For each "user group" event there was a separate contract between DCI and the sponsoring company. Each contract provided that profit would be split between the sponsoring company and DCI and did not provide for profits to be distributed to petitioner. DCI staff coordinated the events, prepared brochures,

[*4] made hotel and travel arrangements, and kept track of the participants. Sometimes petitioner contacted speakers, but other speakers were contacted by DCI staff. The revenue from the events was deposited in accounts referred to as "user group accounts", which used DCI's Andover, Massachusetts, address and DCI's Federal tax identification number. DCI paid the expenses of the events from either the user group accounts or from DCI's general account.

Petitioner is married to Sandra Schussel. He is the father of Stacey Griffin and another daughter and the father-in-law of Michael Griffin. In November 1987, petitioner, his wife, and Stacey Griffin established an account at Fidelity Investments in the name of Digital Consulting International. Petitioner also maintained other accounts with Fidelity Investments. (The various accounts will be referred to in this opinion as the Fidelity accounts without differentiating the specific name on each account because petitioner used the funds in all of the accounts as his personal funds.)

In February 1988, petitioner, his wife, and Stacy Griffin incorporated Digital Consulting International Limited (DCIL) in Bermuda. The same month they established an account at the Bank of Bermuda in the name of DCIL. DCIL was a shell company that never conducted any business and never filed any Federal income tax returns.

[*5]  Starting in 1988 petitioner caused the following amounts to be transferred to the DCIL Bermuda bank account:

| Year | Total |
| --- | --- |
| 1988 | $1,428,000 |
| 1989 | 340,000 |
| 1990 | 45,000 |
| 1991 | 731,000 |
| 1992 | 1,174,000 |
| 1993 | 1,666,121 |
| 1994 | 2,360,453 |
| 1995 | 3,816,546 |

Most of the funds were thereafter transferred to petitioner's Fidelity accounts and used by petitioner as his own.  The funds so transferred in 1995 included $610,000 of $850,000 reported as salary on petitioner's Form 1040, U.S. Individual Income Tax Return, for 1995.  Otherwise, the funds transferred to Bermuda were not reported on DCI's income tax returns or on petitioner's individual income tax returns.

The amounts transferred from DCI to the Bermuda DCIL account included checks from user group accounts made out to DCI or DCIL or checks from third parties made out to DCI.  The amounts so transferred were determined to be the amounts not needed for DCI's expenses.  They were not based on the value of any services or intellectual property provided by petitioner.

**[\*6]** In 1995, petitioner was interested in selling DCI. In order to do so, he wanted DCI's income to reflect the amounts that had previously been transferred to the Bermuda account and had not been recorded on DCI's books or reported on its Federal income tax returns. As a result, petitioner discontinued the practice of transferring DCI receipts to the DCIL Bermuda account.

From 1988 through 1995, DCI was a C corporation and filed Forms 1120, U.S. Corporation Income Tax Return. The transfer of DCI receipts to Bermuda was not discovered during audits of DCI's returns for 1986 through 1990 and 1993. However, in early November 1997, while auditing DCI's return for 1995, a revenue agent began questioning checks payable to DCI deposited in DCIL's account. Petitioner prepared a bogus contract between DCI and DCIL allegedly for a term of two years beginning January 4, 1994, to be presented to the revenue agent by the lawyer he had hired to represent DCI in the audit. Petitioner picked the dates of the contract to coincide with termination of the practice of sending money to Bermuda, which was supposed to stop on December 31, 1995. While he was preparing the contract, he looked out the window of his home and observed his gardener mowing the lawn. Petitioner signed the name of his gardener as the "managing director" executing the contract on behalf of DCIL.

**[\*7]**   Petitioner, Gomes, Reed, and Michael Griffin devised a scheme referred to as "Project Phoenix" to conceal DCI's true income from the Internal Revenue Service (IRS).  This scheme involved discarding copies of checks and deleting information from DCI's computer database.  However, the revised computer records were not provided to the IRS.

On February 26, 2004, petitioner, Gomes, and Reed were indicted on tax evasion charges.  Gomes and Reed pleaded guilty.  Petitioner was tried and, on January 25, 2007, he was convicted of two counts of tax evasion under section 7201 with respect to his 1995 individual return and DCI's 1995 corporate return.  He was also found guilty of conspiracy to defraud the United States.  He was sentenced to five years in prison and completed his sentence in June 2011.

Beginning with tax year 1996, DCI elected S corporation status.  In 1997, petitioner converted DCI to a Massachusetts business trust.  In 2004, the trust's name was changed to Driftwood Massachusetts Business Trust (Driftwood).  Driftwood filed Federal income tax returns as an S corporation from 2004 through 2010.

DCI ceased operations in 2004 and became insolvent as a result of the criminal investigation of petitioner.  The last gross receipts reported by DCI or Driftwood were $4,615,479 for 2004.  The DCI and Driftwood returns reported

[*8] loans from petitioner totaling $2,141,786 from 2001 through 2010 and deducted legal and consulting expenses that related to defense of the criminal proceedings against petitioner. The amounts deducted from 2000 through 2010 totaled $3,961,122.

Payments to petitioner's two daughters for their assistance in case preparation, processing payments to the Government, and subsequent State investigations of petitioner's State tax liability were deducted on the corporation's tax returns as consulting expenses, with the resulting losses claimed by petitioner as the owner of the S corporation. Payments to a clemency attorney after petitioner's conviction were also claimed as corporate legal fees for 2008.

On May 5, 2009, respondent issued a notice of deficiency for DCI's 1993, 1994, and 1995 tax years. DCI did not contest the notice, and on October 19, 2009, the following amounts were assessed against DCI:

|  | 1993 | 1994 | 1995 |
|---|---|---|---|
| Tax | $622,455.00 | $889,445.00 | $1,321,449.00 |
| Fraud penalty | 466,841.25 | 667,083.75 | 991,086.75 |
| Total | 1,089,296.25 | 1,556,528.75 | 2,312,535.75 |

Because of DCI's insolvency, efforts to collect the assessed liabilities from its assets would be futile.

**[*9]**  In the notice of transferee liability, respondent determined that the value of

property transferred to petitioner was as follows:

|                                       | 1993           | 1994           | 1995           |
|---------------------------------------|----------------|----------------|----------------|
| Value of Property Transferred to You  | $2,044,106.00  | $2,522,944.00  | $4,356,279.00  |

> The above named transferee is liable for the lesser of the value of the
> property transferred, plus interest as provided by law, or the balance of
> the liability, plus accrued interest.  Accordingly, the transferee's
> liability for the 1993, 1994 and 1995 assessed liability of the transferor
> is limited to the above stated value of property transferred to him for
> the three years.

The value was determined to be the amounts transferred from the Bermuda DCIL

account back to petitioner's Fidelity accounts.

## OPINION

Section 6901(a) provides that the liability, at law or in equity, of a transferee

of property "shall * * * be assessed, paid, and collected in the same manner and

subject to the same provisions and limitations as in the case of the taxes with

respect to which the liabilities were incurred".  Section 6901(a) does not

independently impose tax liability upon a transferee but provides a procedure

through which the IRS may collect unpaid taxes owed by the transferor of the

assets from a transferee if an independent basis exists under applicable State law

or State equity principles for holding the transferee liable for the transferor's

[*10] debts.  Commissioner v. Stern, 357 U.S. 39, 45 (1958); Hagaman v. Commissioner, 100 T.C. 180, 183 (1993).  Thus, State law determines the elements of liability, and section 6901 provides the remedy or procedure to be employed by the Commissioner as the means of enforcing that liability.  Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148 (1961).   The IRS bears the burden of proving that the transferee is liable as a transferee of property of a taxpayer but does not have the burden of proving that the taxpayer was liable for the tax.  Sec. 6902(a); Rule 142(d).  The existence and extent of transferee liability are determined according to the law of the State where the transfer occurred--in this case, Massachusetts.

Before October 6, 1996, the applicable law was the Massachusetts Uniform Fraudulent Conveyance Law (MUFCL).  Mass. Gen. Laws ch. 109A (repealed 1996).  On July 8, 1996, Massachusetts enacted the Uniform Fraudulent Transfer Act (MUFTA), striking out the MUFCL in its entirety.  Uniform Fraudulent Transfer Act, 1996 Mass. Acts 830.  MUFTA was made effective October 6, 1996. Id.  Although the transfers in issue from DCI to DCIL occurred before the effective date of MUFTA, some of the transfers from DCIL to the Fidelity account occurred after the effective date.  Under either law, transferee liability may result from actual fraud.

[*11] The MUFCL provided for liability where either actual fraud or constructive fraud is present. Mass. Gen. Laws ch. 109A, secs. 4 - 7 (repealed 1996). Specifically, with respect to actual fraud, MUFCL sec. 7 provided that a debtor's conveyance made "with actual intent * * * to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."

Under MUFTA, transferee liability arises where there is either actual or constructive fraud. Mass. Ann. Laws ch. 109A, secs. 4 - 7 (LexisNexis 2005). With respect to actual fraud, MUFTA sec. 5 provides that "[a] transfer made * * * by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made * * * if the debtor made the transfer * * * with actual intent to hinder, delay, or defraud any creditor of the debtor".

Petitioner does not give us any reason to doubt that the transfers from DCI to DCIL to avoid tax on DCI's income and to enable transfers of unreported income to petitioner's Fidelity accounts were fraudulent as to respondent as a creditor. The evidence of fraud is compelling. The evidence shows transfers of funds to avoid payment of Federal income tax, concealment of income, fabrication of records, false representations to IRS personnel, and other indicia of actual fraud. Thus we need not discuss principles of constructive fraud.

**[*12]** Petitioner does not argue that respondent's proof is lacking as to any element of transferee liability under Massachusetts law, and we conclude that respondent's burden of proof as to liability has been satisfied. Petitioner asserts that his liability is limited to $7,358,394 (plus interest as provided by law), which is the amount respondent determined to be "dividend income" in a separate audit in relation to petitioner's individual income tax liabilities for the years in issue. Alternatively petitioner agrees that his maximum liability is $8,923,329 as determined in the notice of transferee liability but disagrees with his interest liability.

The "dividends" determination of petitioner's individual tax liability in a separate proceeding is not material here. The stipulated evidence in this case establishes the larger amounts transferred to petitioner's Fidelity accounts during the three years in issue.

The real difference between the parties, however, relates to the interest for which petitioner is liable as a transferee. Petitioner argues that he is liable for interest under Massachusetts law only from the time of the notice of liability. He cites only Massachusetts law relating to prejudgment interest in tort cases.

Respondent argues that, under applicable Federal law, petitioner is liable for the interest accruing on DCI's liabilities because fraudulently transferred assets

[*13] were in his hands before DCI's liabilities for each year accrued on March 15, 1994, 1995, and 1996.  Moreover, the value of the fraudulently transferred assets petitioner received each year exceeded the tax and penalty owed by DCI for 1993, 1994, and 1995 as of March 15 of the following year.  Thus, according to respondent, section 6901(a) applies, and interest on DCI's deficiencies runs from the date the tax was due until paid, and section 6601(e)(2)(B) provides the same period for interest on the fraud penalties due from DCI.  See Estate of Stein v. Commissioner, 37 T.C. 945, 961 (1962); Lowy v. Commissioner, 35 T.C. 393, 396-397 (1960); Butler v. Commissioner, T.C. Memo. 2002-314.

> Respondent concedes in his reply brief that the
>
> Notice of Liability would have been clearer if it had omitted in the statement of DCI's assessed liabilities the amount of interest that respondent assessed, as a routine matter, at the same time he assessed the tax and penalties.  However, the inclusion of this extraneous information does not invalidate the notice or prohibit respondent from taking the position, fully supported by the law and not dependent on any new facts causing surprise to petitioner, that interest runs on the deficiencies from the due dates of DCI's returns because the amounts transferred to petitioner, even under petitioner's own reckoning, exceed the amount of assessed tax and penalties.

In other words, respondent is not claiming that petitioner is liable for all of the interest that has accrued on DCI's assessed deficiencies and penalties.  The interest for which petitioner is liable is separate and is accruing on the transferee

[*14] liability determined in the notice. That interest is the amount due under Federal law and accrues from the time DCI's payments were due. See Lowy v. Commissioner, 35 T.C. at 396. Petitioner attempts to distinguish Lowy and Butler by arguing that the values of the transferred assets in those cases exceeded the transferors' liabilities, but that is the same situation as exists here when the interest assessed against DCI is disregarded. We agree with respondent's arguments that interest on the deficiencies and penalties runs against petitioner as of the time that DCI's returns were due.

Nature of the Diverted Receipts

Petitioner next argues that the funds transferred to him from user accounts were payments for his intellectual property and not income of DCI. Respondent argues that this explanation is not credible because petitioner was not paid for his intellectual property after 1995, when, according to petitioner, the only change in DCI's operation was that the income was retained by DCI. During the earlier years, DCI received only reimbursement for expenses of the events involved in the user accounts although DCI employees performed organizational, promotional, operational, and accounting services in relation to those events. Petitioner was paid a substantial salary from DCI, including $850,000 in 1995. The argument

**[*15]** that all profit from the user group events was additional compensation to petitioner is not reasonable or credible.

Petitioner asserts that forming DCI as a C corporation was a mistake because tax at the corporate level could have been avoided if S corporation status had been elected earlier. He testified: "[W]e'd gotten into this whole mess any way, because it was like, well, why should I be paying double taxes. We didn't want to pay double taxes. Why should you have, basically, a family business, and you are paying double taxes." If his present contention is correct, there would have been no "double taxation" issue because the profits earned on DCI's operations would have been deducted as compensation to him.

Petitioner argues in his brief that Reed confirmed that the diverted funds were payments for petitioner's intellectual property. Reed's testimony to that effect was only in response to leading questions from petitioner's counsel. She also testified that from her standpoint petitioner and DCI were the same. She followed his instructions about transferring funds to Bermuda and knew that the funds were not being reported on DCI's tax returns. The scheme by which DCI gross receipts were diverted to Bermuda was terminated so that prospective purchasers of DCI's business could be shown DCI's true earnings. All of these

**[\*16]** explanations and all contemporaneous evidence concerning DCI's operations are inconsistent with the current claim that the funds were not DCI's income.

In several other respects, we believe that petitioner's testimony is improbable and unreliable. He claims, for example, that he "had no clue" that his attorney was going to give the bogus contract between DCI and DCIL to the IRS. He claims naivete about the tax reporting of DCI and the audit of DCI, asserting that Reed and the accountants were responsible for it, but this scenario is unconvincing in view of his intelligence and education, his concern with double taxation, and the deliberate and omitted evasion of personal income tax on millions of dollars of income.

If the transfers from DCI's user accounts were for bona fide corporate expenses, they would have been deductible to the corporation and there would not have been a concern about double taxation or about concealing DCI's unreported income. Because the amounts transferred were taxable to petitioner in either event, and he has been punished for failing to report the income on his personal tax returns, he sees no downside in attempting to rewrite history. The claim that petitioner was receiving payments for his intellectual property is improbable and belated, and we do not accept it.

**[*17]** <u>Nature of Loans to DCI or Driftwood</u>

Finally, petitioner claims that his liabilities should be reduced by the amounts of certain transfers back to DCI accounts from 2001 through 2010 that were originally recorded as loans to DCI. He asserts that the amounts used to pay attorney's fees and consulting expenses were properly regarded as expenses of the corporation because defending the prosecution defended the business of DCI. He testified that after DCI assets were sold, he loaned personal funds to the corporation to pay his legal bills because he was advised by his criminal defense attorney, his counsel of record in this case, that the legal bills were properly chargeable to and deducted by the S corporation as legal expenses.

Petitioner has not, however, presented any invoices or other evidence of a proper apportionment of fees for his personal defense, defense of the count for evasion of corporate taxes, or work on determining civil tax liabilities. He has cited neither evidence that the corporation was responsible for the legal and consulting fees nor authority for the claimed credits. To the extent that there is testimony about the services performed, that testimony indicates that they were for petitioner personally. The corporation was out of business when the loans were made and had nothing to gain or lose by defending or not defending the charges. The corporation did not contest the civil tax liabilities in response to the notice of

[*18] deficiency that was the basis of the tax assessed for 1993, 1994, and 1995. The amounts loaned to the corporation were never available to pay its tax liabilities. We need not decide whether any of the claimed expenses would be properly apportioned between petitioner and the corporation, or between deductible or nondeductible, because we decide only whether loans by petitioner to the corporation should reduce the transferee liabilities in issue.

It appears that recording loans to a defunct entity, paying expenses and deducting them on an S corporation return, and passing through the resulting losses to petitioner's personal income tax returns was simply a way to create the appearance that personal expenses were business expenses. In any event, the amounts that petitioner transferred to DCI accounts were recorded as loans, not as repayment of income diverted from it in 1993, 1994, and 1995, and he is not entitled to disregard the contemporaneous characterization. See United States v. Sorrentino, 726 F.2d 876, 883 n.3 (1st Cir. 1984) (citing Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943)). In sum, he contends that his liability as a transferee for corporate income taxes that he caused to be evaded should be reduced by the costs of defending himself from the consequences of his fraud. We are not persuaded that law or reason justifies that result.

**[\*19]** We have considered the other arguments of petitioner.  They are contrary to the evidence, legally erroneous, or irrelevant.  They do not affect our conclusions.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.